**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

-------------------------------------------------------------- x

| | | |
|---|---|---|
| MONAHAN PRODUCTS LLC | : | Case No.  18-cv-11561 (FDS) |
| d/b/a UPPABABY, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SAM'S EAST, INC. and | : | |
| SAM'S WEST, INC., | : | |
| Defendants. | : | |
| | : | |

-------------------------------------------------------------- x

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.     INTRODUCTION ....................................................................................................1

II.    PROCEDURAL BACKGROUND.........................................................................3

III.   FACTS ....................................................................................................................4

IV.    ARGUMENT.........................................................................................................10

       A.    Summary Judgment Standard ...............................................................10

       B.    No Basis For Award of Future Corrective Advertising Costs ..............11

       C.    No Basis For Award of "Extra" Expenses Incurred .............................13

       D.    No Basis for Disgorgement of Profits as a Remedy for Trademark Infringement
             and False Advertising in this Case........................................................15

       E.    No Basis for Massachusetts Unfair Competition Claim .......................16

V.     CONCLUSION.....................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aktiebolaget Electrolux v. Armatron Int'l, Inc.*,
  999 F.2d 1 (1st Cir. 1993) ......................................................................................15

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...............................................................................................11

*Austrian Airlines Oesterreichische Lufverkehrs AG v. UT Fin. Corp.*,
  No. 04 Civ. 3854(RCC) (AJP), 2005 U.S. Dist. LEXIS 7283
  (S.D.N.Y. Apr. 28, 2005) .......................................................................................14

*Bern Unlimited, Inc. v. Burton Corp.*,
  95 F. Supp. 3d 184 (D. Mass. 2015) ......................................................................10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...............................................................................................10

*Coll v. PB Diagnostic Sys.*,
  50 F.3d 1115 (1st Cir. 1995) ..................................................................................10

*First Act, Inc. v. Brook Mays Music Co.*,
  429 F. Supp. 2d 429 (D. Mass. 2006) ....................................................................11

*Fishman Transducers, Inc. v. Paul*,
  684 F.3d 187 (1st Cir. 2012) ..................................................................................16

*Hipsaver Co. v. J.T. Posey Co.*,
  497 F. Supp. 2d 96 (D. Mass. 2007) ......................................................................15

*Mesnick v. Gen. Elec. Co.*,
  950 F.2d 816 (1st Cir. 1991) ..................................................................................10

*Nat'l Fire Prot. Ass'n v. Int'l. Code Council, Inc.*,
  No. 03-10848-DPW, 2006 U.S. Dist. LEXIS 14360
  (D. Mass. Mar. 29, 2006) ............................................................................12, 14, 15

*Noonan v. Staples, Inc.*,
  556 F.3d 20 (1st Cir. 2009) ....................................................................................11

*PBM Prods., Inc. v. Mead Johnson & Co.*,
  174 F. Supp. 2d 417 (E.D. Va. 2001) ....................................................................11

4813-7938-9354v.1

*PODS Enters., Inc. v. U-Haul Int'l, Inc.*,
   126 F. Supp. 3d 1263 (M.D. Fla. 2015) ...............................................................10

*Raxton Corp.* v. *Anania Assocs., Inc.*,
   668 F.2d 622 (1st Cir. 1982) ................................................................................15

*Vt. Pure Holdings, Ltd. v. Nestle Waters N. Am., Inc.*,
   No. 03-11465-DPW, 2006 U.S. Dist. LEXIS 13683 (D. Mass. Mar. 28, 2006) ....................15

STATUTES

15 U.S.C. §§ 1051, *et seq.*..............................................................................................11

15 U.S.C. § 1116 ............................................................................................................11

15 U.S.C. § 1117 ............................................................................................................11

15 U.S.C. § 1117(a) .......................................................................................................15

15 U.S.C. § 1118 ............................................................................................................11

Massachusetts General Law Ch. 93A ...............................................................................2

Mass. Gen. Laws Ann. Ch. 93A, § 11 ...........................................................................16

RULES

Fed. R. Civ. P. 26(a) ........................................................................................................2

Fed. R. Civ. P.  30(b)(6).........................................................................................*passim*

Fed. R. Civ. P. 56(a) ......................................................................................................10

4813-7938-9354v.1

I.     **INTRODUCTION**

Defendants Sam's East, Inc. and Sam's West, Inc. (together, "Sam's Club") hereby file a motion for partial summary judgment directed to plaintiff Monahan Products LLC ("Monahan")'s damages claims and its state law unfair competition claim.

This case involves Sam's Club's lawful sale of ███ **genuine** UPPAbaby brand strollers for which it made incremental profits of $ ████ .  Monahan, the owner of the UPPAbaby brand, has asserted claims of trademark infringement, false advertising, and unfair competition arising out of the "unauthorized" sale of its strollers by Sam's Club.  Monahan advances three theories of monetary recovery:

• Costs of future corrective advertising;

• so-called "extra" expenses, i.e., compensation for salaried employees' time; and

• disgorgement of Sam's Club's profits.

Sam's Club seeks a ruling from the Court that no damages have been established by Monahan, and there is no basis for recovery under any of these theories.

The principal remedy sought by Monahan is an award for a future corrective advertising campaign in an amount ranging from about $800,000 to, potentially, over $8,000,000.  (Jason Decl.[1] Ex. 4, at 6-7.)  Monahan seeks this remedy even though there has been no evidence adduced as to any damage caused by Sam's Club to Monahan or to the UPPAbaby brand; no evidence as to the content of such a campaign; no evidence as to the potential efficacy of such a campaign; and no evidence as to who the targets of such a campaign would be.  It is a purely

---

[1] "Jason Decl." refers to the Declaration of Marc J. Jason filed herewith.

1

speculative theory of recovery that was concocted at the end of fact discovery when Monahan realized it had no evidence to support the large damage award that it craves.[2]

In addition to this windfall, Monahan seeks an award of so-called "extra" expenses that it incurred consisting of the value of its salaried employees' time spent dealing with the alleged harm done by Sam's Club in the amount of $██████. The dollar figure is based solely on a "loss assessment" document for which there is no evidentiary support and the legal theory has no support. Moreover, the document was created and produced to Sam's Club weeks after the close of fact discovery. The document should, therefore, be stricken from the record.

Monahan's third theory of recovery is a disgorgement of Sam's Club's profits totaling $██████. This remedy is not warranted because Monahan and Sam's Club are not competitors – as required in this Circuit for disgorgement-- and Sam's Club's sales of UPPAbaby strollers did not deprive Monahan of its sales and profits. In fact, Monahan earned its profits upon sales of the very same strollers to its distributor. Thus, Monahan suffered no damages and there is nothing to warrant disgorgement.

 In addition to Monahan's damages claims, summary judgment should be granted dismissing Monahan's Count IV of the First Amended Complaint for unfair competition under Massachusetts General Law Ch. 93A. Such claim requires that the alleged wrongdoing occurred "primarily and substantially" in Massachusetts. However, Sam's Club's advertising and sales of UPPAbaby strollers occurred throughout the United States, so Monahan's claim must fail.

---

[2] Monahan never claimed in its discovery responses, in its Rule 26(a) damage disclosure, or in its Rule 30(b)(6) witness testimony that it wanted or planned to conduct a corrective advertising campaign.

4813-7938-9354v.1

II.    **PROCEDURAL BACKGROUND**

Monahan filed its initial Complaint in this action in July 2018 (ECF No. 1) and a First

Amended Complaint on September 17, 2018 (ECF No. 12).  Fact discovery was conducted over

the course of more than a half year.  Pursuant to the amended Scheduling Order (ECF No. 40),

the fact discovery deadline was July 12, 2019; and a status conference was conducted shortly

before the deadline on July 10, 2019.

During the discovery period, in response to Monahan's broad discovery requests, Sam's

Club produced more than 43,000 pages of documents and six fact witnesses for deposition.

Sam's Club took the depositions of Monahan's principal, Lauren Monahan, and its Vice

President of Sales, Joanne Apotheloz, who was Monahan's Rule 30(b)(6) witness on all topics,

including damages.

On August 2, 2019, Monahan served two expert reports: a damages report by Krista Holt;

and a marketing/corrective advertising report by Ross Fishman.  On the same day, Monahan filed

a motion to compel further fact discovery that purportedly related to its newly concocted

corrective advertising theory.  Monahan made this motion even though it had represented to the

Court at the July 10 status conference – two days before the close of fact discovery -- that there

were no outstanding discovery issues or disputes to address.  Monahan's meritless and wasteful

motion to compel was briefed and argued by the parties, and it was denied by the magistrate

judge in its entirety.  (ECF No. 59.) Monahan never appealed this denial to the Court.

On August 6, more than three weeks after the close of fact discovery, Monahan produced

a document called "UPPAbaby Loss Assessment."  (Jason Decl. Ex. 7.)  The document purports

to put a dollar value on time spent by Monahan employees remediating the alleged damage

caused by Sam's Club.  The document was created during the week of July 28, 2019 (SOF ¶

22[3]), <u>after</u> the close of fact discovery and <u>after</u> Monahan's Rule 30(b)(6) witness had testified during her deposition that she had not been "privy" to such calculations.  (Jason Decl. Ex. 2, at 119-120.)

On September 6, 2019, Sam's Club served two rebuttal expert reports: Abel Teshome rebutting the Holt report; and Dr. Russell Winer rebutting the Fishman report.  Expert depositions were subsequently conducted of Ms. Holt, Mr. Fishman, and Dr. Winer.  Monahan declined to take the deposition of Sam's Club's damages rebuttal expert, Mr. Teshome.

Following the close of expert discovery, the Court conducted a status conference on October 16, 2019, at which time the Court set a schedule for summary judgment and Daubert briefing.

III.    **FACTS**

Monahan is in the business of manufacturing and selling baby products, including its UPPAbaby strollers, to retailers.  (SOF ¶ 1.)   Sam's Club is an operator of membership-only warehouse clubs and online retail platforms throughout the United States.  (SOF ¶ 2.)

Towards the end of 2017, Sam's Club began marketing and selling genuine UPPAbaby strollers to its members via its website, SamsClub.com.  Sam's Club purchased the UPPAbaby strollers from a supplier named Akstrom Imports Inc. ("Akstrom") which had in turn acquired the strollers from Global Brand and Leasing ("Global"), an authorized distributor for Monahan.  Global had purchased the strollers directly from Monahan, and Monahan made its profits on the sale of the strollers to Global.  (SOF ¶ 6.)  Consequently, Monahan is not seeking -- and could not seek -- recovery of its lost profits in this case.

---

[3] "SOF ¶ __" refers to the corresponding paragraph in Defendants' Statement of Material Facts in Support of Their Motion for Partial Summary Judgment filed herewith.

Sam's Club sold 1,336 UPPAbaby strollers through early 2019 and incremental profits were $█████.[4]  (SOF ¶¶ 7, 8.)  The strollers are not currently being sold by Sam's Club.

Monahan's First Amended Complaint asserts claims of trademark infringement, false advertising, and related state and common law claims in connection with Sam's Club's sale of the UPPAbaby strollers.  These claims arise in connection with Monahan's "manufacturer's warranty": namely, Monahan's assertion that the manufacturer's warranty does not apply to strollers sold at "unauthorized" retailers such as Sam's Club; and alleged false statements by Sam's Club regarding the warranty.[5]

Sam's Club maintains that its sale of UPPAbaby strollers was lawful and that it is not liable under any cause of action.  However, this motion is not directed to the issue of liability.  It is directed to the issue of damages and to the underpinning of the state law claim.

During discovery, there was no evidence adduced of any past or future lost sales or lost profits by Monahan.[6]  There was no evidence adduced of any harm to Monahan's reputation or harm to the UPPAbaby brand.[7]  Monahan undertook no analysis of its market share in the

---

[4] Monahan's damages expert, Ms. Holt, accepted Mr. Teshome's calculation of incremental expenses deducted from gross sales of the strollers.  (Jason Decl. Ex. 5, at 92.)  Consequently, Sam's Club's profit figure is not disputed.

[5] Monahan has also alleged that, in at least one instance, Sam's Club failed to fulfill a customer's order as advertised (Sam's Club advertised UPPAbaby strollers with leather handlebars, but then delivered models with foam handlebars).  This last allegation is nowhere to be found in the pleadings in this case.

[6] Monahan's Rule 30(b)(6) witness, Ms. Apotheloz, testified that she was "not privy" to calculations of future lost profits and other damages.  (Jason Decl. Ex. 2, at 118-121.) Monahan's principal, Ms. Monahan, testified that she did not know whether the company was able to quantify any loss it had suffered from Sam's Club's sales of the strollers.  (*Id.* at Ex. 1, at 80-81.)

[7] Ms. Apotheloz also testified that she did not know of any value placed by Monahan on alleged harm to its reputation and goodwill.  (*Id.* at Ex. 2, at 121.)

industry.  (Jason Decl. Ex. 2, at 117.)  There is no evidence whatsoever of any quantifiable

damage or harm to Monahan.  In fact, during the time that Sam's Club sold UPPAbaby strollers,

Monahan's sales of the strollers actually increased.  (SOF ¶ 10.)

Over the course of the litigation it has become apparent that Monahan brought this action

simply because UPPAbaby strollers were sold at Sam's Club and that Sam's Club's retail prices

are lower than ███████████████████████████████████████████

███████████████.  Monahan also does not like Sam's Club's image as a discount, big box

retailer.  As Ms. Monahan testified, "[t]he simple fact [that Sam's Club was] advertising"

UPPAbaby products was of concern to Monahan.  (Jason Decl. Ex. 1, at 50.)  But the mere fact

of advertising and selling the product at Sam's Club at a low price, below Monahan's MAP, does

not give rise to any legally cognizable claim.

### Krista Holt Report

Ms. Holt, Monahan's damages expert, advanced three theories of monetary relief: costs

of future corrective advertising; "extra" expenses incurred for Monahan salaried employees'

time; and disgorgement of Sam's Club's profits.  In support of these theories, Ms. Holt

performed no analysis whatsoever.  She merely adopted information provided to her and spit it

back out in her report.

The first theory of recovery advanced by Ms. Holt, prospective corrective advertising

costs, is based on nothing more than a regurgitation of the Fishman report and the quotes of an

advertising agency, Small Army, contained in the report.  (*Id.* at Ex. 6, at 27-31.)  Ms. Holt did

not perform any quantitative analysis regarding harm to Monahan or the UPPAbaby brand, and

did not consider the potential content or efficacy of a corrective advertising campaign.  All she

did was adopt some of the quoted figures supplied by Small Army and repeated in the Fishman

report regarding the costs of mailing postcards to more than 20 million people or purchasing Google search terms – and advocated for the lower end of the estimates ($840,000 to $1,050,000) under the pretense of being conservative and reasonable.

The second theory that Holt advanced was so-called "extra" expenses. (*Id.* at Ex. 6, at 32-34.) This consists of the purported value of time spent by Monahan's salaried employees, including senior executives like Lauren Monahan and Joanne Apotheloz, allegedly dealing with the harm caused by Sam's Club's sale of UPPAbaby strollers. The activities for which Monahan claims compensation included fielding complaints by Monahan's retail customers and UPPAbaby consumers as well as responding to media inquiries. The damage figure, $████, is based entirely on a document called the UPPAbaby Loss Assessment which Ms. Holt simply adopted and incorporated into her report. (*Id.* at Ex. 6, at Ex. 8.0.) Once again, Ms. Holt provided no analysis whatsoever or any attempt to quantify additional or incremental expenses allegedly incurred by Monahan as a result of Sam's Club's actions. Instead, she simply rubber-stamped the Loss Assessment document. The Loss Assessment, which is unsupported by evidence[8], was not even created until the week of July 28, 2019, i.e., right at the time her report was served and weeks after the close of fact discovery. (SOF ¶ 22.)

The third theory advanced by Holt was disgorgement of Sam's Club's profits. (Jason Decl. Ex. 6, at 34-35.) Once again, Ms. Holt did not perform any analysis whatsoever. She simply stated Sam's Club's figure for gross sales of the UPPAbaby stroller, and then cited the relevant statute that the plaintiff must only prove defendant's sales, and the defendant must prove all costs or deductions claimed. (*Id.* at Ex. 6, at 34.) Ms. Holt performed no analysis to arrive at

---

[8] Monahan's rule 30(b)(6) witness, Ms. Apotheloz, testified that she did not know what the figures were and did not even have a ballpark estimate of the figures. (Jason Decl. Ex. 2, at 119-120.)

a number for Sam's Club's profits.  However, during her deposition she testified that she

accepted the figure for incremental expenses that were deducted from sales by Sam's Club's

rebuttal expert, Abel Teshome.  (*Id.*at Ex. 5, at 92.)  Consequently, the figure for Sam's Club's

profits is not in dispute.

### Ross Fishman Report

Ross Fishman was engaged by Monahan to "offer my opinion regarding the corrective

advertising necessary for UPPAbaby to remedy the damage allegedly caused by actions of

[Sam's Club]."  (*Id.* at Ex. 4, at 1.)  Fishman, a "full-time law firm marketing professional," with

negligible experience in retail marketing and zero experience with issues of corrective

advertising proffered an opinion as to the cost of a hypothetical corrective advertising campaign.

In rendering his opinion, Mr. Fishman assumed damage to the UPPAbaby brand (SOF ¶

15) and that corrective advertising is necessary (Jason Decl. Ex. 3, at 48-49).  He performed no

analysis as to whether corrective advertising is actually warranted, whether it would be effective,

or what the content would be (SOF ¶ 13).  He did not seek to determine whether the UPPAbaby

brand had been damaged.  He did not commission any survey.  Mr. Fishman did not speak with

Monahan employees or conduct any research or analysis at all.

> Q.   Did you speak to any of Monahan's retailers, authorized retailers?
> A.   No.
> Q.   Did you speak to any consumers who purchased strollers from Sam's Club?
> A.   No.
> Q.   Did you communicate with retailers or consumers in any way in preparing this
> report?
> A.   No.
> MR. HARRIS:  Objection. You can answer.
> Q.   Your report contains no analysis or methodology for quantifying the number of

eyeballs that viewed UPPAbaby on samsclub.com; is that correct?

MR. HARRIS:  Objection. You can answer.

A.    That's correct.

Q.    Your report also contains no analysis or methodology for quantifying the number of eyeballs that viewed UPPAbaby in Sam's Club flyers; is that correct?

MR. HARRIS:  Objection.

A.    That's correct.

Q.    Your report contains no analysis or methodology for quantifying the amount of alleged damage to Monahan's reputation and brand value; is that correct?

MR. HARRIS:  Objection.

A.    That's correct.

(Jason Decl. Ex. 3, at 150-151.)

Mr. Fishman's report consists principally of copied price quotes received from an advertising agency, Small Army, for the costs of either preparing and mailing postcards to more than 20 million people, i.e., all Sam's Club members, or, in the alternative, purchasing unspecified search terms from Google.  (*Id.* at Ex. 4, at 5-7.)  Small Army is an advertising agency that was engaged by Monahan's counsel and that Mr. Fishman had never used before. (SOF ¶ 20.)  Despite never having worked with Small Army, Mr. Fishman did not even bother to speak to them in connection with preparing his report.  (SOF ¶ 20.)  Small Army was engaged by counsel and communications were through counsel.  (SOF ¶ 20.)  Mr. Fishman adopted the Small Army quote even though he had no idea about the content of any corrective advertising nor about how the portion of the quote relating to such content was determined.  (Jason Decl. Ex. 3, at 107-108.)

Mr. Fishman conducted no analysis and developed no methodology to ascertain how many Sam's Club members may have been exposed to advertising of the UPPAbaby strollers or may have done Google searches for UPPAbaby strollers.  (SOF ¶¶ 17, 18, Jason Decl. Ex. 3, at 161-162.)

9

Mr. Fishman's report was rebutted by Sam's Club's expert, Dr. Russell Winer.  Dr. Winer is an eminent marketing expert and professor at the Stern School of Business, New York University.  His vast experience includes having been the marketing expert for the successful plaintiff in what was characterized by Ms. Holt as a seminal corrective advertising case, *PODS Enters., Inc. v. U-Haul Int'l, Inc.*[9]  (Jason Decl. Ex. 5, at 23-26.)  Dr. Winer opined that Mr. Fishman failed to develop any methodology to determine how many Sam's Club members were exposed to the alleged false advertising.  Thus, there is no basis to ascertain any alleged harm to Monahan.  Dr. Winer concluded that the "'corrective advertising' estimates produced in the Fishman report and re-produced in the Holt damages report are worthless and not based in fact." (*Id.* at Ex. 11, at 11.)

IV.   **ARGUMENT**

    A.   **Summary Judgment Standard**

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Bern Unlimited, Inc. v. Burton Corp.*, 95 F. Supp. 3d 184, 204 (D. Mass. 2015) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56 mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that

---

[9] 126 F. Supp. 3d 1263, 1282-85 (M.D. Fla. 2015).

determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc*., 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (footnotes omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

B.     **No Basis For Award of Future Corrective Advertising Costs**

The Lanham Act governing trademarks (15 U.S.C. §§ 1051, *et seq*.) provides various remedies for infringement and false advertising violations.  The statute provides for injunctions (15 U.S.C. § 1116); awards of defendant's profits and damages sustained by the plaintiff (15 U.S.C. § 1117); and destruction of infringing articles (15 U.S.C. § 1118).  The statute does not provide for corrective advertising.

The case law establishes that corrective advertising is an extraordinary remedy.  In *First Act, Inc. v. Brook Mays Music Co.*, the court noted that "*prospective* remedial advertising is a somewhat novel theory of damages that has been limited in its application." (Emphasis in original.)  *First Act, Inc. v. Brook Mays Music Co.,* 429 F. Supp. 2d 429, 438 (D. Mass. 2006) (citing *PBM Prods., Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 417, 420 (E.D. Va. 2001) ("There have only been a few false advertising case[s] where a federal court granted prospective corrective advertising expenditures.")  The *First Act* court further stated that a damage award for prospective remedial advertising requires that it compensate the injured party for ***identifiable*** harm to its reputation.  *First Act*, 429 F. Supp. 2d at 438.

11

*Nat'l Fire Prot. Ass'n v. Int'l. Code Council, Inc.*, No. 03-10848-DPW, 2006 U.S. Dist. LEXIS 14360 (D. Mass. Mar. 29, 2006) was relied on by Monahan in support of its motion to compel. In that case, the court recognized that an award of corrective advertising must be "determinable-with-reasonable-certainty" and must not provide a windfall to the plaintiff. *Nat'l Fire Prot.*, 2006 U.S. Dist. LEXIS 14360, at *95.

In this case, Monahan did not adduce any evidence of identifiable, quantifiable harm to its reputation, to its business, or to its UPPAbaby brand.  Monahan's false advertising claim in the First Amended Complaint is directed to the manufacturer's warranty.  However, Monahan's experts, Holt and Fishman, incorrectly assert that the mere sale by Sam's Club of UPPAbaby strollers at low prices constitutes false advertising.  (*E.g.,* Jason Decl. Ex. 3, at 54.)

Vague assertions by Monahan that its business suffered as a result of Sam's Club's actions are unsubstantiated.  Sam's Club did nothing wrongful in selling genuine UPPAbaby products at discounted prices.  Nevertheless, assuming *arguendo* that Sam's Club did commit wrongful acts (which it did not), there is no EVIDENCE of any harm to Monahan.  Monahan's assertions that its retail partners complained directly about Sam's Club's actions also are vague and unsubstantiated and do not evidence harm to Monahan.  No such retailers have been identified in Monahan's initial disclosures, interrogatory answers, produced documents or deposition testimony.  There is no evidence of this or of any harm caused to Monahan.

Similarly, Monahan has asserted that Sam's Club's discounted pricing raised the question of whether the UPPAbaby products were second quality or inferior, or whether Monahan was in financial distress or had other reasons for deeply discounting its strollers.  Once again, there has been no evidence adduced regarding any of these perceived harms to Monahan.  There is nothing wrongful about selling the strollers at discounted prices.  Since there is no evidence of harm to

12

Monahan, there is no basis at all for the extraordinary remedy of prospective remedial advertising.

The corrective advertising "expert," Mr. Fishman, did not conduct any research, perform any analysis, commission any survey, or develop any methodology to quantify harm to Monahan. Instead, he simply incorporated Small Army's estimates of costs for postcard mailings and Google search term purchases. Mr. Fishman's report is an insufficient basis to support a claim for anywhere between $827,000 and $8,882,502 in future damages relating to corrective advertising that was never even contemplated by Monahan.

The extraordinary remedy now sought by Monahan is not appropriate in this case for at least the reasons that it is not determinable with reasonable certainty, there has been no identifiable harm to Monahan, and it would provide a windfall to Monahan.

### C.    No Basis For Award of "Extra" Expenses Incurred

Ms. Holt advanced a claim for so-called "extra" expenses incurred by Monahan because of purported remediation work done by Monahan salaried employees. The claim of $██████ is based entirely on the UPPAbaby Loss Assessment (SOF ¶ 24), a document that was fabricated by Monahan and produced to Sam's Club during the first week of August 2019, weeks after the July 12, 2019 close of fact discovery. As a result, Sam's Club was deprived of the opportunity to question Monahan's fact witnesses about the document.

Monahan's Rule 30(b)(6) witness, Ms. Apotheloz, was questioned about this nebulous category of alleged damage and was unable to provide any information.

> Q.  But here I'm just talking about the businesses [sic] calculations and how your lost profits were calculated, and you're saying you were not privy to those calculations?
>
> A.  Well, I did a calculation with time that was spent and managing of the retailers, but as far as the bottom line, the amount, I'm not privy to that.

Q.   And what was that calculation you were just talking about?

A.   Just going through the information and the investigation and just everyone's time and efforts and mitigating the retailers in social media.

Q.   Actually, looking at this response to the interrogatory, the very next line says, "UPPAbaby's time and resources spent taking corrective action and educating the public and its resellers concerning the infringement." Do you see that?

A.   Yes.

Q.   So is that what you're talking about, the calculation that you did make?

A.   Yes.

Q.   And what is that number?

A.   I don't remember off the top of my head.

Q.   Do you have a ballpark figure of what that number was?

A.   I don't.

(Jason Decl. Ex. 2, at 119-120.)

The failure of Monahan to follow the procedural rules and disclose the extra expense figures and Loss Assessment document prior to the close of fact discovery is without justification.  Monahan had this information in its possession.  Consequently, the document should be precluded, and Ms. Holt and Monahan fact witnesses should be precluded from testifying about it and about this theory of recovery. *See, e.g., Nat'l Fire Prot. Ass'n*, 2006 U.S. Dist. LEXIS 14360 (theory of corrective advertising damages and supporting affidavit precluded by court when not provided prior to close of fact discovery) (citing, *Austrian Airlines Oesterreichische Lufverkehrs AG v. UT Fin. Corp.*, No. 04 Civ. 3854(RCC) (AJP), 2005 U.S. Dist. LEXIS 7283 (S.D.N.Y. Apr. 28, 2005) (court precluded damage theory not disclosed during fact discovery).

Furthermore, Monahan cannot point to any precedent where a plaintiff was awarded a reimbursement for salaried, executive employees' time spent allegedly remediating damage

14

when such expense was not incremental, i.e., additional, since the employees' salaries were fixed and would have been incurred in any event.

> D.  **No Basis for Disgorgement of Profits as a Remedy for Trademark Infringement and False Advertising in this Case**

Pursuant to the Lanham Act, a successful plaintiff "shall be entitled, . . . subject to the principles of equity, to recover": (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  15 U.S.C. § 1117(a).  "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.  Such sum . . . shall constitute compensation and not a penalty." *Id.*

To implement these statutory directives, the First Circuit has adopted the following four rules, summarizing the additional showings required to secure an award of damages under the Lanham Act.

> 1) a plaintiff seeking damages must prove actual harm, such as the diversion of sales to the defendant; 2) a plaintiff seeking an accounting of defendant's profits must show that the products directly compete, **such that defendant's profits would have gone to plaintiff if there was no violation**; 3) the general rule of direct competition is loosened if the defendant acted fraudulently or palmed off inferior goods, such that actual harm is presumed; and 4) where defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory. (Emphasis added.)

*Nat'l Fire Prot. Assn.*, 2006 U.S. Dist. LEXIS 14360, at *80-81 (quoting *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 5 (1st Cir. 1993).

Thus, a plaintiff seeking disgorgement of defendant's profits must ordinarily prove "both actual harm and direct competition."  *Hipsaver Co. v. J.T. Posey Co.*, 497 F. Supp. 2d 96, 106 (D. Mass. 2007); *see also Vt. Pure Holdings, Ltd. v. Nestle Waters N. Am., Inc.,* No. 03-11465-DPW, 2006 U.S. Dist. LEXIS 13683, at *36 (D. Mass. Mar. 28, 2006).  In *Raxton*

*Corp.* v. *Anania Assocs., Inc.*, 668 F.2d 622, 625 (1st Cir. 1982), the court did not authorize an accounting for profits when "[t]he two companies do not compete directly for business . . . and [plaintiff] offered no proof of actual damages."

In this case, Monahan is a manufacturer that sells its products to retailers.  (SOF ¶ 1.) Sam's Club is a retailer.  Monahan and Sam's Club do not compete for business, and Sam's Club's sale of UPPAbaby strollers did not divert sales or profits from Monahan.  In fact, Monahan collected its profits from sales of the same strollers that were eventually purchased and sold by Sam's Club.  (SOF ¶ 6.)  The parties clearly do not compete.  (SOF ¶ 3.)  Moreover, there is no evidence whatsoever that Sam's Club acted fraudulently in this matter, or that there was inequitable conduct on the part of Sam's Club.  Therefore, under the law of the First Circuit, Monahan is not entitled to a disgorgement of Sam's Club's profits.

E.   **No Basis for Massachusetts Unfair Competition Claim**

A claim under Massachusetts' unfair competition statute requires that the wrongful actions "occurred primarily and substantially within the commonwealth [of Massachusetts]." Mass. Gen. Laws Ann. Ch. 93A, § 11.  "Where wrongdoing is not focused on Massachusetts but has relevant and substantial impact across the country, the 'primarily' requirement of section 11 cannot be satisfied."  *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012). Even if a plaintiff is based in Massachusetts so that all of the alleged harm arguably occurs in Massachusetts, the requirement of section 11 cannot be satisfied if the impact of the alleged deception was on customers all over the country.  *Id.*

In this case, it is beyond dispute that Sam's Club's activities impacted customers throughout the United States.  (SOF ¶ 25.)  Consequently, Monahan cannot sustain a claim under this statute.

16

V.     **CONCLUSION**

For the foregoing reasons, Sam's Club's motion for partial summary judgment should be granted.

Dated: December 6, 2019                    Respectfully submitted,

                                           */s/ Marc J. Jason*
                                           Anthony F Lo Cicero (*Pro Hac Vice*)
                                           Marc J. Jason (*Pro Hac Vice*)
                                           AMSTER, ROTHSTEIN & EBENSTEIN LLP
                                           90 Park Avenue
                                           New York, New York 10016
                                           Telephone: (212) 336-8000
                                           Facsimile: (212) 336-8001
                                           E-mail:  alocicero@arelaw.com
                                           E-mail: mjason@arelaw.com


                                           Adam L. Littman
                                           ARENT FOX LLP
                                           The Prudential Tower
                                           800 Boylston Street, 32nd Floor
                                           Boston, MA 02199
                                           Telephone: (617) 973-6195
                                           Fax: (617) 722-4939
                                           E-mail: adam.littman@arentfox.com
                                           ***Counsel for Defendants Sam's East, Inc.***
                                           ***and Sam's West, Inc.***

4813-7938-9354v.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on December 6, 2019, I caused to be electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will automatically send an email notification of such filing to registered participants. Any other counsel of record will receive the foregoing via e-mail in PDF format.


*/s/ Marc J. Jason*
Marc J. Jason

4813-7938-9354v.1