**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MONAHAN PRODUCTS LLC d/b/a UPPABABY,<br><br>        Plaintiff,<br><br>   v.<br><br>SAM'S EAST, INC. and SAM'S WEST, INC.,<br><br>        Defendants. | No. 1:18-cv-11561-FDS<br><br><br>REDACTED PUBLIC VERSION |

**MOTION FOR SUMMARY JUDGMENT
OF TRADEMARK INFRINGEMENT**

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ ii

Table of Authorities ............................................................................................................ iii

I.  Background ................................................................................................................ 2

    A.  Monahan's UPPAbaby Strollers ....................................................................... 2

    B.  Sam's Club's Gray Market Import Scheme ....................................................... 6

II.  Legal Standards for Summary Judgment ................................................................. 8

III.  Sam's Club Has Infringed Monahan's Trademarks .................................................. 9

    A.  Monahan's Registered Marks Are Entitled to Trademark
        Protection Because They Are Registered and/or Incontestable .......................... 10

    B.  Sam's Club Has Infringed Monahan's Trademarks by Importing
        Gray Market Goods with Materially Different Characteristics than
        UPPAbaby's Authorized Products ..................................................................... 12

IV.  Conclusion .............................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Attrezzi, LLC v. Maytag Corp.*,
    436 F.3d 32 (1st Cir. 2006) .......................................................................................... 18

*Bel Canto Design, Ltd. v. MSS Hifi, Inc.*,
    837 F. Supp. 2d 208 (S.D.N.Y. 2011) ......................................................................... 17

*Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*,
    562 F.3d 1067 (10th Cir. 2009) .................................................................................... 15

*Bos. Duck Tours, LP v. Super Duck Tours, LLC*,
    531 F.3d 1 (1st Cir. 2008) .............................................................................................. 9

*Bose Corp. v. Ejaz*,
    No. CIV.A. 11-10629-DJC, 2012 WL 4052861 (D. Mass. Sept. 13, 2012),
    *aff'd*, 732 F.3d 17 (1st Cir. 2013) .............................................................................. 13

*Calero-Cerezo v. U.S. Dep't of Justice*,
    355 F.3d 6 (1st Cir. 2004) .............................................................................................. 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ....................................................................................................... 9

*Colt Def. LLC v. Bushmaster Firearms, Inc.*,
    486 F.3d 701 (1st Cir. 2007) ................................................................................. 10, 11

*Davidoff & CIE, S.A. v. PLD Int'l Corp.*,
    263 F.3d 1297 (11th Cir. 2001) .................................................................................... 12

*Gamut Trading Co. v. U.S. Int'l Trade Comm'n*,
    200 F.3d 775 (Fed. Cir. 1999) ..................................................................................... 17

*Heraeus Kulzer LLC v. Omni Dental Supply*,
    No. CIV.A. 12-11099-RGS, 2013 WL 3305284 (D. Mass. July 1, 2013) ............. 13, 18

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
    738 F.3d 1085 (9th Cir. 2013) ................................................................................ 15, 17

*Montblanc-Simplo GmbH v. Staples, Inc.*,
    172 F. Supp. 2d 231 (D. Mass. 2001) .......................................................................... 12

*Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*,
    816 F.2d 68 (2d Cir. 1987) ..................................................................................... 15, 16

*SKF USA Inc. v. Int'l Trade Comm'n*,
  423 F.3d 1307 (Fed. Cir. 2005) ........................................................................... 15

*Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*,
  982 F.2d 633 (1st Cir. 1992) ................................................... 9, 10, 12, 15, 17, 18

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992) ............................................................................................ 10

**Statutes**

15 U.S.C. § 1065 ..................................................................................................... 10

15 U.S.C. § 1115(b) ................................................................................................ 10

Fed. R. Civ. P. 56(b) ................................................................................................. 9

Plaintiff Monahan Products LLC d/b/a UPPAbaby ("Monahan"), respectfully moves for summary judgment of trademark infringement against Defendants Sam's East, Inc. and Sam's West, Inc., (collectively "Sam's Club").

Monahan brought this action for trademark infringement and false advertising as a result of Sam's Club's infringing sale of Monahan's products that Sam's Club obtained through the gray market without Monahan's authorization. *See generally Complaint and Jury Demand,* ECF No. 1.

Sam's Club had tried for years to become an authorized seller of UPPAbaby products, but had been repeatedly told that it was not an appropriate distribution channel for Monahan's stylish, high quality, but accessibly-priced strollers. *See* Harris Decl. Ex. A ("Monahan Depo. Tr."), at 82:2-13. Unable to accept that Monahan did not want to do business with them on UPPAbaby products, Sam's Club turned to its "alternative source" team, also referred to as its "diverted goods" team, to purchase UPPAbaby strollers on the gray market and import them into the United States for sale. *See* Harris Decl. Ex. C ("Nipps Depo. Tr.*"),* at 35:15-35:11.

However, UPPAbaby strollers sold through Sam's Club's gray market import scheme were not covered by Monahan's warranty because Sam's Club is not an authorized retailer for UPPAbaby strollers, and the strollers imported by Sam's Club were not meant for sale in the United States. *Warranty Information*, Amended Complaint, Ex. 2. Nonetheless, Sam's Club falsely advertised on its website that its unauthorized UPPAbaby products were protected by a "6-month manufacturer warranty." *Sam's Club Website Excerpts*, Amended Complaint, Ex. 3.

Sam's Club knew that its unauthorized UPPAbaby products were not covered by any manufacturer's warranty because the importer that Sam's Club purchased the gray market goods from had certified that no manufacturer's warranty covered those products. *See Supplier's*

*Alternatively Sourced Brands Representation and Certification Form*, Harris Decl. Ex. I; Harris

Decl. Ex. E ("Olivero Depo. Tr."), at 136:9-140:8. Sam's Club disregarded the certifications by

its supplier because, as Sam's Club's 30(b)(6) witness testified, "██████████████████

████████ *Olivero Depo. Tr.*, at 140:9-19, 151:3-9.

Monahan does care about its warranty to safeguard the goodwill of its UPPAbaby®

brand and associated registered trademarks. In addition to its warranty, Monahan only sells

through authorized retailers, such as boutique and higher-end department stores, and ensures that

retailers have the knowledge and training they need to sell and service UPPAbaby® products.

Harris Decl. Ex. B ("Apotheloz Depo. Tr."), at 9:12-19, 31:5-19. Monahan places restrictions on

its warranty, and on who it will do business with, in order to support the goodwill and public

perception of its brands, and properly exercise quality control over its supply lines, which it

could not do with respect to Sam's Club's gray market imports.

Sam's Club's gray market import scheme constitutes trademark infringement. There is

no dispute that Monahan's trademarks are incontestable or otherwise entitled to protection.

Likewise, there are no material disputes as to the essential facts regarding Sam's Club's gray

market importation of goods, including the differences between Monahan's warranty and Sam's

Club's "guarantee." Accordingly, Monahan is entitled to summary judgement that Sam's Club is

liable for trademark infringement as a matter of law.

## I.    BACKGROUND

### A.    Monahan's UPPAbaby Strollers

Monahan was founded in Massachusetts in 2006 by husband and wife Bob and Lauren

Monahan. The company, with headquarters in Rockland, Massachusetts, developed strollers that

were sleek, stylish, and user-friendly, without matching the exorbitant price tags of luxury

strollers then on the market. Monahan's first stroller, the UPPAbaby Vista, was an immediate hit

with parents across the U.S.  Monahan followed up its initial success with a line of strollers, car seats, and accessories, including the UPPAbaby Cruz and the UPPAbaby G-Luxe, all of which have helped propel Monahan strollers into more than 40 countries.

  

*UPPAbaby® VISTA® Stroller*      *UPPAbaby® CRUZ® Stroller*      *UPPAbaby® G-LUXE® Stroller*

Monahan's UPPAbaby strollers have quickly earned a worldwide reputation for high quality and for their distinctive design.  New York Magazine called the UPPAbaby Vista® "[h]ands down, the most recommended stroller among our experts" when it named that product its "Best overall stroller" in 2019.  *L. Schwartzberg & L. Ro*, "The Best Strollers, According to Baby Experts," *New York Magazine* (Sept. 27, 2019), *available at* http://nymag.com/strategist/article/best-strollers.  Vogue magazine called the Vista "at last, a hip stroller for all."  *M. Ruiz*, "How Uppababy Is Winning the Stroller Wars," *Vogue* (April 1, 2016) *available at* https://www.vogue.com/article/uppababy-interview-bob-lauren-monahan. UPPAbaby strollers have been lauded by experts, bloggers, and celebrities alike:

> Jackie Oliva, founder of the blog As the Stroller Turns and a mother of two, said that the stroller has become ubiquitous in her hometown of Chicago. "Moms joke the Vista is the only stroller you see," she said. ("I have reached the infamous stroller Zen," she wrote in her review of the 2015 Vista.) Uppababy has even become the chosen stroller among celebrities: Reese Witherspoon pushes a Vista; Mark Zuckerberg chose the lighter stroller model, Cruz; and Sofia Vergara's Modern Family character even brought her new baby home in Uppababy's Mesa car seat.  *Id.*

In order to properly police its brands, and ensure customers receive the highest quality of service, Monahan only sells UPPAbaby products through authorized retailers. *Monahan Depo. Tr.*, at 43:10-45:17. Monahan deploys a team of sales representatives to train retailers on how to sell and service the products, how to unpackage and assemble them, and how to understand and use the specific features of the strollers. *Apotheloz Depo. Tr.*, at 10:3-11:6. Because customers who experience a problem with their UPPAbaby strollers may go back to the retailer they purchased it from for help, Monahan's representatives train its authorized retailers to answer customers' support questions, perform ordinary maintenance, and assist customers in how to obtain a repair or return directly from Monahan. *See id.* at 70:7-71:21. The training and support provided by these representatives is invaluable to both stores and the end-customers, because Monahan sells different products for different needs, and expecting or first-time parents may not always have the experience to know what features they need at a given time in their child's development. *See id.* at 11:7-20.

The high quality of Monahan's UPPAbaby strollers is backed by Monahan's strong manufacturer's warranty (the "Monahan Warranty") and customer support team. Monahan generally warrants its UPPAbaby strollers to be free from manufacturing defects for two years from the date of purchase. *Warranty Information*, Amended Complaint, Ex. 2. When a customer registers an UPPAbaby product with Monahan within the first three months of purchase, Monahan will extend the Monahan Warranty to three years. *Apotheloz Depo Tr.*, at 65:15-66:8. When customers contact Monahan for help with products under warranty, Monahan's customer service specialists guide customers through simple repairs, or offer and send customers replacement parts. *Id.* at 69:6-70:6.

Monahan has confidence in its Monahan Warranty because Monahan takes care to minimize the number of steps in its supply chain to reduce the potential damage and maintain quality control. UPPAbaby strollers are imported into the United States directly from the factory to a Monahan warehouse in Rockland, Massachusetts. *Apotheloz Depo. Tr.*, at 26:12-25. Monahan utilizes quality control teams both at the originating factory, and at its warehouse, capable of identifying damaged products and preventing them from being sold. *Monahan Depo. Tr.*, at 38:15-39:4. The strollers are then distributed directly to retailers for sale to customers. *Apotheloz Depo. Tr.*, at 26:18-27:25. From the moment an UPPAbaby stroller is built until it is handed to the U.S. customer, Monahan's UPPAbaby strollers remain under the control of Monahan or entities that have contracted with, and been trained by, Monahan to handle its products.

In order to justify the resources Monahan devotes to training retailers and supporting its customers, Monahan requires that its authorized retailers agree to its minimum advertised price policy. Monahan's pricing policy helps ensure that Monahan's UPPAbaby® brand strollers are high quality, and that customers receive the service and support they have come to expect from Monahan. *Apotheloz Depo. Tr.*, at 31:5-19.

Monahan also places reasonable conditions on its Monahan Warranty for its own protection, and the protection of its authorized retailers. For example, an UPPAbaby stroller will not be covered by the Monahan Warranty if it is not purchased from an authorized retailer, if the product is second-hand, or if it has been modified or incorrectly repaired by a third party. *Warranty Information*, Amended Complaint, Ex. 2. Importantly, the Monahan Warranty is only available if the product is purchased by a consumer in its originally designated country of purchase. *Id.*

## B. Sam's Club's Gray Market Import Scheme

Sam's Club's interest in Monahan's products dates back several years. Walmart's sales team requested to sell Monahan products in 2016 and 2017, and was denied. *See e.g.,* Harris Decl. Ex. F.

Because Sam's Club knew it could not obtain authorized products directly from Monahan, it engaged in a scheme to purchase "diverted items" from ███████████████ ████████████████████████ *Nipps Depo. Tr.*, at 35:15-35:11. ███████ was, and continues to be, a major source of "name brand" goods for Sam's Club that Sam's Club cannot obtain through authorized channels. *Claypool Depo. Tr.*, at 31:11-24, 36:21-37:6.

After purchasing the diverted UPPAbaby products through ███████ with whom Monahan had no relationship, the products were shipped to a shipping/receiving center in New York where they were repacked, relabeled, palletized, and wrapped. *Claypool Depo. Tr.*, at 55:22-56:23, 57:1-13. The products were then shipped again to Sam's Club at its distribution center in Searcy, Arkansas. *Nipps Depo. Tr.*, at 32:1-22; *Claypool Depo. Tr.*, at 58:10-25. The Searcy facility acts as Sam's Club's central holding facility for "alternatively sourced goods." *Claypool Depo. Tr.*, at 27:3-28:12 ███████."). Some of the products received at Searcy might be broken apart or opened for inspection. *Claypool Depo. Tr.*, at 63:13-18. Those products then have to be re-palletized and shipped to a fulfillment center. *Id.* at 26:20-27:2, 63:19-64:1. From there, products are purchased online at samsclub.com and shipped to Sam's Club members using non-specific third parties such as UPS, FedEx, the postal service, or just ███████" *Id.* at 59:6-18. Every step along this extended supply chain created the potential for damage, loss, mispackaging, or mislabeling that Monahan cannot control against.

The material aspects of Sam's Club's gray market import scheme are substantially undisputed. There is no dispute that Sam's Club offered UPPAbaby® strollers for sale on its

website. *Sam's Clubs' Resp. to Monahan's 1st Req. for Admission*, Harris Decl. Ex. G, at 4. There is no dispute that Sam's Club is not an authorized retailer for UPPAbaby strollers, and that the Monahan Warranty did not apply to those products offered by Sam's Club. *Id.*; *Olivero Depo. Tr.*, at 138:6-:140:19. Sam's Club has admitted that it purchased the products at issue in this litigation from ███, *Sam's Club's Resp. to Monahan's 2nd Req. for Admission,* Harris Decl. Ex. H, at 3-4, and that it imported those products into the United States. *See e.g., Sam's Club Website Excerpts*, Amended Complaint, Ex. 3. Sam's Club has conceded that it sold at least ███ units of UPPAbaby® Vista®, Cruz® and G-Luxe® strollers, and that it has distributed tens of millions of advertisements to its customers and potential customers, advertising UPPAbaby products for significantly lower prices than required by Monahan's pricing policy. *Olivero Depo. Tr.*, at 89:4-90:1; *July 22 Letter*, Dkt. 47-6, at 2-3.

There is also no reasonable dispute that Sam's Club knew it was importing unauthorized goods that were not covered by the Monahan Warranty. Sam's Club and Walmart had tried for years to gain authorization to sell UPPAbaby products and had been repeatedly told that they were not an appropriate distribution channel. *Monahan Depo. Tr.*, at 82:6-13. Sam's Club's supplier even certified that the UPPAbaby® strollers it sold to Sam's Club were **_not_** covered by any manufacturer warranty. *See Supplier's Alternatively Sourced Brands Representation and Certification Form*; *Olivero Depo. Tr.*, at 136:9-140:8. Sam's Club didn't care. *Olivero Depo. Tr.*, at 140:9-19. Even after Monahan warned Sam's Club about its infringing activity, Sam's Club continued to sell UPPAbaby strollers until Monahan cut off its supply. *See Cease and Desist Letter*, Harris Decl. Ex. J; *Emails Re: Cease and Desist Letter*, Harris Decl. Ex. K.

Despite clear knowledge that its gray market UPPAbaby products were not covered by the Monahan Warranty, Sam's Club falsely advertised on its website that the products were

covered by a "6 month manufacturer warranty." *Sam's Club Website Excerpts*, Amended

Complaint, Ex. 3. And Sam's Club's customer service representatives repeatedly and falsely

told potential customers that Sam's Club was an authorized retailer for UPPAbaby® products.

*Walmart Chat Excerpt*, Harris Decl. Ex. L; *Claypool Depo. Tr.*, at 4:13-17 ████████

████ .

   Several months after this litigation began, Sam's Club changed its warranty information

to indicate that now a "100% Merchandise Satisfaction Guarantee" applied to its UPPAbaby

strollers. *See Amended Complaint*, Ex. 3 (noting "6 month manufacturer warranty" applied as of

filing of Complaint). Sam's Club's "Guarantee" is not a manufacturer's warranty. Under Sam's

Club's guarantee, members seeking to redeem it may receive a replacement product or a refund

on their purchase. *Olivero Depo. Tr.*, at 165:16-166:1. However, Sam's Club does not supply its

customers with replacement parts, does not offer repair services, and does not offer any of the

additional training or events that Monahan provides to purchasers of authorized products.

*Olivero Depo. Tr.*, at 170:18-171:1. Since Monahan has cut off Sam's Club' supply of gray

market UPPAbaby strollers, Sam's Club ***can only offer a refund*** to customers with complaints

about unauthorized UPPAbaby products.

   Sam's Club's gray market sales of UPPAbaby strollers is trademark infringement. The

essential facts of Sam's Club's gray market import scheme are not in dispute, nor is the fact that

Sam's Club's unauthorized UPPAbaby products are not covered by the Monahan Warranty.

Monahan is therefore entitled to summary judgement that Sam's Club is liable for trademark

infringement as a matter of law.

## II.  <u>LEGAL STANDARDS FOR SUMMARY JUDGMENT</u>

   Summary judgment shall be granted where the moving party "shows that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(b). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986)). The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

For summary judgment on a claim for infringement of a registered trademark, the plaintiff need only show (1) that its mark is entitled to trademark protection, and (2) that the infringing use is likely to cause consumer confusion. *Bos. Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008). In a gray market goods case, "a material difference between goods simultaneously sold in the same market under the same name creates a presumption of consumer confusion as a matter of law." *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992). The threshold for materiality is "always quite low" in gray market cases. *Id.* The defendant in a gray market goods case bears the burden of rebutting the presumption of a likelihood of confusion with a preponderance of evidence that the differences are not the kind that consumers, on average, would likely consider in purchasing the product. *Id.*

## III.  SAM'S CLUB HAS INFRINGED MONAHAN'S TRADEMARKS

Sam's Club has infringed Monahan's trademarks as a matter of law by selling gray market UPPAbaby strollers that are materially different from UPPAbaby strollers sold through Monahan's authorized retailers. It is undisputed that Monahan's federally registered and incontestable trademarks are entitled to trademark protection. Sam's Club's unauthorized UPPAbaby strollers were materially different because the Monahan Warranty, which applied only to UPPAbaby strollers sold through authorized retailers, did not apply to the unauthorized

strollers sold by Sam's Club. *See Amended Complaint*, Ex. 2. The law is clear that differences in warranty and service protection between authorized products and gray market alternatives are material differences that create a likelihood of confusion between the trademark owner and the unauthorized gray market seller. *Nestle,* 982 F.2d at 640. And there is no material dispute that the unauthorized UPPAbaby strollers sold by Sam's Club through its gray market import scheme were not covered by the Monahan Warranty. *See Amended Complaint*, Ex. 2. As a result, Monahan is entitled to summary judgment on its claim for trademark infringement. *See Amended Complaint*, at 2-10 ¶¶ 7-26.

A.     **Monahan's Registered Marks Are Entitled to Trademark Protection Because They Are Registered and/or Incontestable**

The Monahan Trademarks, including the UPPABABY®, VISTA®, CRUZ®, and G-LUXE® Marks, are federally registered, and all but the stylized "UPPABABY" Mark are incontestable. Sam's Club has presented no evidence suggesting that any of the Monahan Trademarks are not entitled to trademark protection. Accordingly, there is no reasonable dispute that the marks are eligible for trademark protection.

A mark is entitled to trademark protection if it is capable of functioning as a source-identifier of goods. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). When a trademark has been registered on the Principal Register, it creates a presumption that the trademark is entitled to protection. *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir. 2007). If a registered trademark has become incontestable, the registration is definitive evidence that the mark is protectable. 15 U.S.C. §§ 1065, 1115(b); *Park 'N Fly, Inc. v. Dollar Park & Fly*, Inc., 469 U.S. 189, 191-92 (1985).

Monahan has asserted five incontestable marks in this litigation, for use on goods including strollers, such as those at issue in this litigation:

| Reg. No. | Mark | Reg. Date | Incontest. Date |
|---|---|---|---|
| 3,327,236 | UPPA BABY | Oct. 30, 2007 | Oct. 21, 2013 |
| 3,657,755 | G-LUXE | July 21, 2009 | Feb. 8, 2015 |
| 3,786,731 | VISTA | May 11, 2010 | June 15, 2016 |
| 4,209,160 | CRUZ | Sept. 12, 2012 | Oct. 16, 2017 |
| 4,455,231 | UPPABABY | Dec. 24, 2013 | Jan. 2, 2017 |

*See e.g., Amended Complaint*, Ex. 1, at 11 (indicating acceptance of Sec. 8 & 15 Notices for UPPA BABY Mark). The incontestability of these five marks is conclusive evidence that the marks are entitled to trademark protection. *Park 'N Fly*, 469 U.S. at 191-92.

Monahan has also asserted a sixth trademark in this action directed to the following word mark and design (the "'266 Mark"):



*See Amended Complaint*, at ¶¶ 9-11. There is no material dispute that the '266 Mark has been in continuous use since at least October 1, 2010, on goods that include strollers. *See id.* The registration certificate for the '266 Mark creates the presumption that the '266 Mark is entitled to trademark protection. *Colt,* 486 F.3d at 705. Sam's Club has not alleged, and has presented no evidence, to support any argument that would rebut the presumption of entitlement to trademark protection for the '266 Mark.

Because the Monahan Trademarks are incontestable or federally registered, and Sam's Club has failed to present any evidence or argument to the contrary, Monahan is entitled to summary judgment under the first prong of the trademark infringement analysis.

**B.    Sam's Club Has Infringed Monahan's Trademarks by Importing Gray Market Goods with Materially Different Characteristics than UPPAbaby's Authorized Products**

Sam's Club's gray market scheme to import and sell UPPAbaby products in the U.S. is trademark infringement because of the material differences between the UPPAbaby strollers sold through authorized retailers, and those sold through Sam's Club's gray market import scheme.

A material difference is "any difference between the registrant's product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product." *Montblanc-Simplo GmbH v. Staples, Inc.*, 172 F. Supp. 2d 231, 237 (D. Mass. 2001) (quoting *Nestle*, 982 F.2d at 641). A 'material' difference need not be a physical difference, or even something that would be immediately visible on the product itself. *See id.* A material difference can be a difference that is not blatant enough to make it obvious to a consumer that the origin of the product differs from his or her expectations. *Nestle*, 982 F.2d at 641. In fact, blatant differences between the products ordinarily do not offend the Lanham Act because an ordinary consumer would not be confused as to the source where the products are clearly different. *Id.*

The "subtle differences" in products are those that most easily confuse consumers and are considered material. *Id.*; *see also Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001) ("Because a myriad of considerations may influence consumer preferences, the threshold of materiality must be kept low to include even subtle differences between products."). The material differences test is specifically intended to cover differences that are not blatant enough to make it obvious to the consumer that the origin of the product differs from his or her expectations. *Id.*

Differences in warranty or service protection have long been held to be material differences that amount to trademark infringement under the Lanham Act. *See, e.g., Nestle*, 982

F.2d 641 n. 7.  A common fact pattern finding material differences between the authorized and unauthorized products is where, as here, products sold through unauthorized channels are not entitled to the same warranty available for authorized imports sold through authorized retailers. *See, e.g. Bose Corp. v. Ejaz*, No. CIV.A. 11-10629-DJC, 2012 WL 4052861, at *8 (D. Mass. Sept. 13, 2012), *aff'd*, 732 F.3d 17 (1st Cir. 2013) (1-year warranty on American systems found materially different over 2-year warranty on Australian systems sold on gray market); *Heraeus Kulzer LLC v. Omni Dental Supply*, No. CIV.A. 12-11099-RGS, 2013 WL 3305284, at *6 (D. Mass. July 1, 2013) (German warranty that did not cover products imported to U.S. without authorization found to be material).

An important aspect of the goodwill that Monahan attached to the UPPAbaby® brand, as well as the strollers sold under its Vista®, Cruz® and G-LUXE® marks, was embodied in the Monahan Warranty, and the availability of service and support through Monahan and its authorized retailers. *Warranty Information*, Amended Complaint, Ex. 2; *Apotheloz Depo Tr.*, 10:3-11:6, 65:15-66:8, 69:6-71:21.  It is Monahan's reputation for "sterling customer service" that gives it an edge over Monahan's competition.  *See M. Ruiz*, "How Uppababy Is Winning the Stroller Wars;" *Monahan Depo. Tr.*, at 43:10-45:17.  Indeed, building up its customer service reputation in the face of a particularly demanding clientele of new parents could be considered the more difficult part of building the UPPAbaby brand, compared to simply building high-quality strollers themselves.  *See id.*

Under the Monahan Warranty, customers having a question or experiencing an issue with their UPPAbaby stroller can go to the authorized retailer they purchased the product from to receive support, repairs, or warranty replacement information because the retailer has been trained to service and assemble UPPAbaby products.  *Apotheloz Depo. Tr.*, at 10:3-11:6.

Customers can also contact Monahan directly, and be helped by trained customer service representatives who are able to answer users' questions, walk users through self-repairs, or help the customer complete any warranty repairs, returns or replacements. *Id.* at 69:6-70:6.

The brand-defining access to exceptional customer service and warranty support is not available for UPPAbaby strollers purchased through Sam's Club's gray market import scheme. *Warranty Information*, Amended Complaint, Ex. 2; *see also* supra Part I.A-B. The Monahan Warranty only applies in the original country of purchase and does not apply to products purchased through unauthorized retailers. *Id.*

The Sam's Club "Guarantee" is materially different from the Monahan Warranty such that consumers would consider the differences relevant when purchasing a product. When customers seek service directly from Sam's Club, the only recourse is a replacement if one is available, or a refund when it is not. *See Olivero Depo. Tr.*, at 165:16-166:1. Yet because Sam's Club's supply of gray market UPPAbaby strollers has been cut off and it has since depleted its inventory, ***Sam's Club presently only offers its customers a refund for UPPAbaby strollers***. *Id.* Sam's Club does not provide any of the replacement or repair services provided by Monahan and its authorized retailers, does not host special events, and its employees have not been trained to help answer customers' questions or provide service. *Olivero Depo. Tr.*, at 170:18-171:1. In fact, Sam's Club's employees have had to call Monahan's customer service department in order to obtain information needed to answer questions received from Sam's Club customers. *Customer Service Call*, Harris Decl. Ex. M. And Sam's Club's lack of familiarity with UPPAbaby's product offerings has caused Sam's Club's customers to receive different model year strollers than what they believed they were purchasing. *Nipps Depo. Tr.*, 67:9-69:4.

Sam's Club's unauthorized sales has resulted in actual confusion from customers who have contacted Monahan for support. When customers contact Monahan for service on UPPAbaby products they purchased through Sam's Club, they are upset when they discover that Monahan's famous product support is not available to them. *See e.g., Customer Call*, Harris Decl. Ex. N. Monahan has fielded a number of customer calls in which it had to tell customers that their Sam's Club products were not covered by the Monahan Warranty. *See id.* (customer remarking "I am just so confused" based on information available on Sam's Club website). The law recognizes that these sorts of negative customer support experiences directly impact the goodwill that Monahan has invested in its brands. *See e.g., Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir. 1987).

The broad consensus of appellate courts is that differences in warranty or service protection are the sorts of material differences that run afoul of the Lanham Act, even where the accused gray market goods are otherwise identical to their authorized counterpart. *See, e.g., SKF USA Inc. v. Int'l Trade Comm'n*, 423 F.3d 1307, 1313 (Fed. Cir. 2005) (citing *Gamut Trading Co. v. U.S. Int'l Trade Comm'n*, 200 F.3d 775, 782 (Fed. Cir. 1999)) (lack of English safety labels and English operating manuals was a material difference in gray market tractors); *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1073 (10th Cir. 2009) (agreeing with *Nestle* and *SKF* that warranty and service commitments can be material differences); *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1094 (9th Cir. 2013) (differences in quality control can be material differences).

The finding that differences in warranty or service protections can be "material differences" under the Lanham Act is grounded in the fact that much of the goodwill inherent in a trademark is embodied in the quality of services provided by the source company, and not

merely the physical attributes of the product.  For example, in a case involving gray market Cabbage Patch Kids dolls, it was considered material that the imported dolls had Spanish language "birth certificates" and U.S. fulfillment houses would not "process [the] adoption papers or mail adoption certificates" for dolls imported without authorization.  *Original Appalachian*, 816 F.2d at 73 (holding that the inability for customers to "adopt" the dolls was a difference "that creates the confusion over the source of the product and results in a loss of [the brand owner's] good will.").  Although the dolls themselves were identical, the experience of "adopting" a doll was part of the goodwill of the Cabbage Patch Kids brand, which was damaged through gray market imports.  *Id.*

Sam's Club added to the likelihood of consumer confusion caused by the material differences between the Monahan Warranty and the limited protections offered by Sam's Club by misrepresenting to customers that the UPPAbaby strollers it sold according to its gray market scheme were protected by a "6-month manufacturer warranty."  *Sam's Club Website Excerpts,* Amended Complaint, Ex. 3.  Sam's Club knew that the UPPAbaby products it was selling were not covered by a manufacturer warranty because they were identified as not warrantied by the third-party supplier from whom Sam's Club purchased the products.  *See Supplier's Alternatively Sourced Brands Representation and Certification Form*; *Olivero Depo. Tr.*, at 136:9-140:8.  Sam's Club disregarded the certifications by its supplier because, ***in the words of Sam's Club 30(b)(6) witness under oath,*** ███████████████████.**"**  *Olivero Depo. Tr.*, at 140:9-19; 151:3-9.

Further support for the material differences between authorized UPPAbaby products and the gray market product sold by Sam's Club is represented by the amount of supervision and quality control Monahan exercises over its distribution chain, which it cannot exercise over gray

market products. *See e.g., Hokto*, 738 F.3d at 1094 ("differences in quality control . . . were material differences."); *Nestle*, 982 F.2d at 636 (citing treatise for the principle that "trademark law embodies consumers' expectations of consistent quality whether that quality is high, low or mediocre.") (internal quotations omitted). Building a reputation for "safety, reliability and service" is also part of the goodwill that consumers can associate with a brand or mark. *Gamut Trading*, 200 F.3d at 783. If the consumer would ordinarily rely on the availability of service and support, the sale of gray market products lacking that sort of service and support will "undermine the investment" that the brand owner has made in its product. *Id.*

Monahan attempts to protect the quality of its UPPAbaby products by ensuring that they reach the customer with as few supply chain steps as possible, and maintaining close quality control at all steps in its distribution, from manufacturing until the product is purchased by the customer. *Supra* Part I.A. Sam's Club's gray market import scheme takes goods that have already been shipped internationally and puts them into its own supply chain beyond the supervision and control of Monahan. *Supra* Part I.B. Sam's Club adds at least five additional steps before a product is received by the customer, none of which Monahan accounted for when it designed its packaging and quality control, and any one of which could cause damage or loss that could negatively impact the customer's perception of Monahan's brand. *See Claypool Depo. Tr.*, 59:19-24. Monahan's loss of effective quality control over Sam's Club's gray market goods provides a further basis for finding material differences between the products sold by Sam's Club and authorized sales of UPPAbaby strollers. *See Nestle*, 982 F.2d at 636; *see also Bel Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F. Supp. 2d 208, 229 (S.D.N.Y. 2011) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark.") (citations omitted).

The material differences between Monahan's authorized UPPAbaby products and the UPPAbaby products sold by Sam's Club through its gray market import scheme creates a presumption of a likelihood of confusion that Sam's Club cannot rebut with competent evidence. *Nestle*, 982 F.2d at 641. Sam's Club never deposed any customer witnesses, conducted any customer surveys, or disclosed any evidence to Monahan in this litigation supporting a contention that Sam's Club customers would ***not*** be confused as to the source or origin of its gray market goods. Sam's Club did not mark its products as unauthorized, or provide any disclaimers to customers regarding the origin or sponsorship of its gray market goods. *Cf. Heraeus Kulzer LLC v. Omni Dental Supply*, No. CIV.A. 12-11099-RGS, 2013 WL 3305284, at *7 (D. Mass. July 1, 2013) (disclaimers "effectively disassociating the manufacturer/markholder from that product when used in a context that the markholder does not sponsor or approve" can reduce consumer confusion by making clear the source of the product).

In fact, Sam's Club's actions reinforce the conclusion that a likelihood of confusion exists as a matter of law. Sam's Club falsely claimed its products were covered by a manufacturer's warranty on its website. *Sam's Club Website Excerpts*, Amended Complaint, Ex. 3. And Sam's Club's customer service representatives repeatedly and falsely told potential customers that Sam's Club was an authorized retailer for UPPAbaby® products. *Walmart Chat Excerpt*; *Claypool Depo. Tr.*, at 4:13-17 ("It's the same entity.").

In fact, ***Sam's Club customers were actually confused.*** Monahan received customer calls from Sam's Club customers expressing confusion and believing they were entitled to warranty protection. *Monahan Depo. Tr.*, at 58:15-59:24; see also *Customer Call*, Harris Decl. Ex. N. "[E]vidence of actual confusion [is] often deemed the best evidence of possible future confusion." *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 40 (1st Cir. 2006). Sam's Club's

undisputed actions, as well as Monahan's evidence of actual confusion, show that Sam's Club cannot create a triable issue of fact regarding the question of a likelihood of confusion. Thus, Monahan is entitled to summary judgment on its claim for trademark infringement.

## IV.  CONCLUSION

For the reasons set forth above, Monahan respectfully requests that the Court find, as a matter of law, that Sam's Club has infringed Monahan's trademarks.

Dated: December 6, 2019

Respectfully submitted,

By:  /s/ *Nathan T. Harris*

Craig R. Smith (BBO No. 636,723)
Nathan T. Harris (BBO No. 675,533)
Peter J. Evangelatos (*Pro Hac Vice*)
**LANDO & ANASTASI, LLP**
Riverfront Office Park
One Main Street – 11th Floor
Cambridge, MA 02142
Tel:   (617) 395-7000
Fax:  (617)-395-7070
Email:   csmith@lalaw.com
            nharris@lalaw.com
            pevangelatos@lalaw.com

*Attorneys for Plaintiff Monahan Products LLC*
*d/b/a UPPAbaby*

### CERTIFICATE OF SERVICE

I certify that on December 6, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically sends email notification of such filing to registered participants. Any other counsel of record will receive the foregoing via e-mail in PDF format.

/s/ *Peter J. Evangelatos*
Peter J. Evangelatos