**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
<br>
**MONAHAN PRODUCTS LLC d/b/a**     )
<br>
**UPPABABY,**     )
<br>
    )
<br>
    **Plaintiff,**     )     **Civil Action No.**
<br>
    )     **18-11561-FDS**
<br>
    **v.**     )
<br>
    )
<br>
**SAM'S EAST, INC. and**     )
<br>
**SAM'S WEST, INC.,**     )
<br>
    )
<br>
    **Defendants.**     )
<br>
_____)

**MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, C.J.**

This is an action for trademark infringement and false advertising.  Plaintiff Monahan Products LLC ("UPPAbaby") makes and sells baby strollers under the UPPAbaby brand. Defendants Sam's East, Inc. and Sam's West, Inc. operate Sam's Club, a chain of membership-only retail warehouse stores.[1]

Sam's Club is not an authorized UPPAbaby retailer.  Nevertheless, it acquired and sold UPPAbaby strollers.  UPPAbaby alleges that those sales violated state and federal trademark and unfair competition laws.  That is not because the strollers sold at Sam's Club were counterfeits or stolen property, or knock-offs marketed under a confusingly similar name.  In fact, they were authentic UPPAbaby strollers, sold by the company to an authorized wholesaler.  Instead, UPPAbaby characterizes the strollers as "gray market" goods—that is, products that were only

---

[1] While Sam's East, Inc. and Sam's West, Inc. are formally separate entities, they jointly operate Sam's Club and there does not appear to be any reason to distinguish between them at present.  For the sake of brevity, the Court will refer to them collectively as Sam's Club.

intended for distribution and sale in foreign countries.

The strollers were not, however, tangibly inferior or different versions of the products sold domestically; indeed, they were physically identical.  UPPAbaby nonetheless contends that there were three post-manufacture differences in the strollers that were likely to cause consumer confusion and injure its brand.  First, it contends that it maintains strict quality control in its domestic distribution chain, while Sam's Club does not.  Second, it contends that only its authorized retailers provide appropriate customer support, and that Sam's Club is not such a retailer.  Third, the warranty protection provided by UPPAbaby does not apply if the product is sold by an unauthorized retailer such as Sam's Club.

The parties have cross-moved for summary judgment.  UPPAbaby seeks summary judgment on its claims of trademark infringement, and Sam's Club seeks summary judgment as to the claims for money damages and the claim of a violation of Mass. Gen. Laws ch. 93A.  For the following reasons, the motion of UPPAbaby will be denied and the motion of Sam's Club will be granted in part and denied in part.

## I.    Background

### A.    Factual Background

The following facts are as set forth in the record and are undisputed except as noted.

#### 1.    The Distribution, Sale, and Warranty of UPPAbaby Strollers

UPPAbaby was founded in 2006 by Bob and Lauren Monahan.  (*See* Monahan Dep. at 7:6-19).  It makes and sells baby strollers.  (*Id.* at 7:21-8:4, 10:1-5).  It owns and uses several registered federal trademarks for its strollers, including the name UPPAbaby and the names of several of its stroller models.  (Def. Resp. to Pl. SMF ¶¶ 1-7).

UPPAbaby is not a retailer—in other words, it does not sell strollers directly to consumers.  (Monahan Dep. at 7:21-8:4).  Instead, it sells its strollers at wholesale to be sold by

2

retailers in both the United States and foreign countries.  (*Id.*).  The strollers are manufactured overseas, shipped to UPPAbaby's warehouse in Rockland, Massachusetts, and then distributed from there.  (Apotheloz Dep. at 26:12-25).

UPPAbaby distributes strollers that are to be sold to customers in the United States only to authorized retailers.  (*See* Monahan Dep. at 14:8-19, 43:19-44:3).  Those authorized retailers include Amazon as well as various luxury department stores and smaller boutiques.  (*Id.* at 14:8-19; Apotheloz Dep. at 9:12-19).  According to UPPAbaby's employees, it employs teams of sales representatives that train authorized retailers on how to assemble, sell, and service the strollers.  (Apotheloz Dep. at 10:12-11:6, 70:7-71:4).  UPPAbaby also sets minimum prices at which authorized retailers can sell its strollers—a practice that it refers to as its "manufacturer advertised pricing" or "MAP" policy.  (*Id.* at 31:6-19).

UPPAbaby also sells some of its strollers for international distribution.  It sells those strollers to authorized distributors, rather than directly to retailers.  (*See* Monahan Dep. at 7:21-8:4; 22:4-7).  Those authorized distributors in turn sell the strollers to retailers abroad.  (*See* Apotheloz Dep. at 44:2-8).  UPPAbaby's authorized distributors are required by their contracts with UPPAbaby to sell the strollers they receive only within their selected market areas, and not in the United States.  (*See, e.g.*, *id.*. at 102:23-103:5).

UPPAbaby offers a two-year manufacturer's warranty on all models of its strollers.  (*Id.* at 65:14-66:8).  It extends the warranty to three years for customers who register their product with the company within three months of purchase.  (*Id.*).

According to the terms of the warranty, it has several limitations.  It covers only manufacturing defects.  (*Id.* at 66:10-18; Am. Compl., Ex. 2 ("UPPAbaby Warranty")).  It is not valid outside of the country where the stroller was originally purchased.  (UPPAbaby Warranty).

And, importantly for present purposes, it is not valid for strollers bought from an unauthorized retailer.  (*Id.*).[2]

UPPAbaby characterizes its strollers as premium products.  Its authorized retailers include "smaller boutique stores" and "higher-end department stores."  (Apotheloz Dep. at 9:14-19).  According to Lauren Monahan, one of the company's founders, the UPPAbaby "brand and [its] products have a reputation and an assumption by a consumer of certain quality and services"—a reputation that she said could be harmed if the strollers were sold by unauthorized retailers who lack "the same level of knowledge and service" as authorized retailers or who sell the strollers at lower prices.  (Monahan Dep. at 43:12-44:17).

## 2.  Sam's Club Acquires and Sells UPPAbaby Strollers

Sam's East, Inc., and Sam's West, Inc. are subsidiaries of Walmart Inc.  (*See* Jason Decl., Ex. 10 at 12).  They operate Sam's Club, a chain of membership-only retail warehouse stores throughout the United States.  (*See id.*).  Sam's Club is not and never has been an authorized retailer of UPPAbaby strollers.  (Monahan Dep. at 81:23-82:13).

Nevertheless, Sam's Club acquired several models of UPPAbaby strollers at some point before 2017.  It bought them from Akstrom Imports Inc., a company based in Montreal, Canada.  (Claypool Dep. at 31:11-24, 36:16-24; Def. Resp. to Pl. SMF ¶ 31).  Sam's Club routinely buys products from Akstrom that it cannot obtain directly from a manufacturer.  (*See* Claypool Dep. at 31:11-24; Def. Resp. to Pl. SMF ¶ 32).  Akstrom had acquired the strollers from Global Branding, an UPPAbaby distributor for Central or South America.  (Apotheloz Dep. at 42:5-43:10).[3]  Akstrom told Sam's Club that the strollers would not be covered by the manufacturer's

---

[2] As described below, it is disputed whether UPPAbaby consistently enforces these limitations.

[3] It is unclear whether the name of Monahan's distributor in Central America is Global Branding or Global Leasing.  (*Compare* Monahan Dep. at 22:8-13 (Global Branding) *with* Apotheloz Dep. at 42:5-43:10 (Global Leasing)).  It is also unclear whether Global was Monahan's exclusive distributor in Central America or South

warranty if they were resold in the United States.  (Olivero-Sanchez Dep. at 136:9-139:24).

The parties dispute exactly how the strollers made their way from UPPAbaby's warehouse in Massachusetts to Sam's Club's customers.  UPPAbaby alleges that the strollers were exported and then re-imported into the United States by either Akstrom or Sam's Club at a shipping center in New York.  (*See* Pl. SMF ¶ 34).  Sam's Club says that the strollers were shipped by UPPAbaby to warehouses in the United States and then transferred to Sam's Club warehouses, and that therefore they never left the country.  (Def. Resp. to Pl. SMF ¶ 34).  Based on the evidence in the record, it appears that at least some of the strollers were sent directly from UPPAbaby's warehouses to addresses in the United States.  (*See* Jason Decl., Ex. 3 at 3, Jason Decl., Ex. 4 at 9-10).   In any event, the strollers were eventually sent by Akstrom to a shipping receiver in New York, then to a Sam's Club warehouse in Searcy, Arkansas, and then to Sam's Club "fulfillment centers," where they were shipped to customers.  (*See* Claypool Dep. at 58:10-59:18).

The parties also dispute whether the strollers were unpacked or re-packaged by Sam's Club along the way.  UPPAbaby alleges that when the strollers arrived at the Sam's Club warehouse in Arkansas, employees may have removed them from their shipping pallets or opened their packaging and then put them on new pallets or repackaged them before shipping them to a fulfillment center.  (Pl. SMF ¶¶ 37-38).  Sam's Club disputes those allegations.  (Def. Resp. to Pl. SMF ¶¶ 37-38).  At least some, but not all, merchandise that arrives at Sam's Club's warehouse in Arkansas is taken off shipping pallets—but not repackaged—for inspection.  (*See* Claypool Dep. at 63:13-18).  Whether that happened to any of the UPPAbaby strollers at issue

---

America.  (*Compare* Apotheloz Dep. at 42:5-43:10 (Central America) *with* Monahan Dep. at 22:8-13 (South America)).  In any event, neither of those inconsistencies makes a difference here.

here is not clear on the present record.

Between 2017 and 2019, Sam's Club advertised and sold the UPPAbaby strollers to customers in the United States.  (Def. Resp. to Pl. SMF ¶ 40; *see, e.g.*, Am. Compl., Ex. 3). Sam's Club also offered the strollers for sale on its website at samsclub.com.  (Am. Compl., Ex. 3; Def. Resp. to Pl. SMF ¶ 42).  It did so at prices that were below those permitted by UPPAbaby's MAP policy.  (*See* Jason Decl., Ex. 1).[4]

In total, Sam's Club sold at least 1,336 UPPAbaby strollers to customers in the United States.  (Olivero-Sanchez Dep. at 89:11-17; Jason Decl., Ex. 12).  It made approximately $30,000 in profits on those sales.  (*See* Jason Decl., Ex. 12).

### 3.   Post-Sale Service and Support of the Strollers by Sam's Club

Unlike authorized retailers, Sam's Club does not provide replacement parts or repair services for UPPAbaby strollers.  (*See* Olivero-Sanchez Dep. at 170:18:-171:1; Def. Resp. to Pl. SMF ¶ 48).  Similarly, Sam's Club employees are not specially trained on how to sell or service the strollers.  (Def. Resp. to Pl. SMF ¶ 48).

The parties dispute whether the UPPAbaby strollers sold by Sam's Club were covered by the manufacturer's warranty.  Under the terms of the warranty, they were not, because they were sold by an unauthorized retailer.  (*See* UPPAbaby Warranty).  Nonetheless, it appears that on several occasions, UPPAbaby allowed customers who said they had bought a stroller at Sam's Club to register for the warranty.  (*See, e.g.*, Jason Decl., Ex. 5; Jason Decl., Ex. 6).

Separately, Sam's Club offered its own warranty on the strollers—a "100% Merchandise

---

[4] At least one Sam's Club's flyer advertised UPPAbaby strollers for sale at prices that were supposedly below the normal retail price. (*See, e.g.*, Jason Decl., Ex. 1).  It is hard to say whether those prices fell below what was permitted by the UPPAbaby MAP policy, because the minimum prices set by the policy are not in the record. In any event, Sam's Club does not dispute that it sold the strollers for prices below those permitted by the MAP policy. (Def. Resp. to Pl. SMF ¶ 59).

Satisfaction Guarantee." (Olivero-Sanchez Dep. at 138:21-139:6). Under the terms of that guarantee, "[i]f the quality and performance of member's purchases don't meet their expectations, [Sam's Club will] replace it or give them a refund in most cases." (*Id.* at 165:22-166:1). In addition, for some time, and despite Akstrom's statement to Sam's Club, the Sam's Club website represented that the strollers were covered by a "6 month manufacturer warranty." (Am. Compl., Ex. 3).[5]

### B.   Procedural Background

On July 25, 2018, UPPAbaby filed this action. An amended complaint was filed on September 17, 2018. It alleges four counts against Sam's Club: (1) trademark infringement in violation of 15 U.S.C. § 1114; (2) false advertising in violation of 15 U.S.C. § 1125(a); (3) trademark infringement and unfair competition in violation of Massachusetts common law; and (4) violations of Mass. Gen. Laws ch. 93A.

UPPAbaby has moved for partial summary judgment on its trademark infringement claims. Sam's Club has moved for partial summary judgment as to the claims for money damages and the claim of a violation of Mass. Gen. Laws ch. 93A.[6]

## II.   Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact

---

[5] After the complaint was filed, Sam's Club removed the reference to the manufacturer's warranty and replaced it with a reference to its own "100% Merchandise Satisfaction Guarantee." (Def. Resp. to Pl. SMF at ¶ 46).

[6] Both UPPAbaby and Sam's Club have also filed motions to exclude the testimony of each other's expert witnesses under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Those motions are currently pending. This memorandum and order assumes, without deciding, that those experts' opinions are admissible.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine

issue is "one that must be decided at trial because the evidence, viewed in the light most

flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of

either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)

(citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable

inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st

Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse

party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may

not simply "rest upon mere allegation or denials of his pleading," but instead must "present

affirmative evidence." *Id.* at 256-57.

## III.   Analysis

### A.     Plaintiff's Motion for Partial Summary Judgment

UPPAbaby has moved for summary judgment on its claims of trademark infringement,

which are Counts One and Three of the amended complaint.[7]  "To succeed on a claim of

trademark infringement, a plaintiff must establish (1) that its mark is entitled to trademark

protection, and (2) that the allegedly infringing use is likely to cause consumer confusion."

*Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008).

The parties agree that UPPAbaby holds several registered and incontestable federal

trademarks on the strollers that were sold by Sam's Club.  (*See* Def. Resp. to Pl. SMF ¶¶ 1-12).

---

[7] While UPPAbaby explicitly seeks summary judgment on its claim under the Lanham Act (Count One), it is not entirely clear that it asks the same for its trademark-infringement claim under Massachusetts common law (Count Three).  In any event, "[i]n Massachusetts, the test for common law trademark infringement is the same as under the Lanham Act." *United Oil Heat, Inc. v. M.J. Meehan Excavating, Inc.*, 95 Mass. App. Ct. 579, 581-82 (2019); *see also Bose Corp. v. Ejaz*, 2012 WL 4052861, at *8 n.4 (D. Mass. Sept. 13, 2012).

The principal disputed issue is whether the use of those marks by Sam's Club is likely to cause consumer confusion.

### 1.    Whether the "First-Sale" Doctrine Applies

Sam's Club first raises a threshold issue.  It contends that under the "first-sale" doctrine, any trademark protection was exhausted after the first authorized sale of the products—that is, when UPPAbaby sold the strollers to Global Branding, its authorized distributor.

"Under the 'first sale' doctrine, the trademark protections of the Lanham Act as to a particular item are exhausted after the trademark owner's first authorized sale of that individual product." *Montblanc–Simplo GmbH v. Staples, Inc.*, 172 F. Supp. 2d 231, 236 (D. Mass. 2001), *vacated pursuant to settlement agreement*, 175 F. Supp. 2d 95 (D. Mass. 2001); *see Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 638 (1st Cir. 1992).  "This is true even if the second sale is without the mark owner's consent." *Heraeus Kulzer LLC v. Omni Dental Supply*, 2013 WL 3305284, at *3 (D. Mass. July 1, 2013).  "The underlying rationale stems from the proposition that the resale of *genuine* products does not confuse consumers and therefore is not a concern of the Lanham Act." *Id.*

However, the first-sale doctrine does not bar trademark enforcement when "genuine, but unauthorized, imports"—often called "gray goods" or "gray-market goods"—"differ materially from authentic goods authorized for sale in the domestic market." *Nestle*, 982 F.2d at 638; *cf. Bose Corp. v. Ejaz*, 732 F.3d 17, 20 (1st Cir. 2013) (defining "gray-market goods").  That is because "an unauthorized importation may well turn an otherwise 'genuine' product into a 'counterfeit' one," since "a difference in products bearing the same name confuses consumers and impinges on the local trademark holder's goodwill." *Nestle*, 982 F.2d at 638.

Accordingly, the resale of trademarked products in the United States may violate the Lanham Act if "they (a) were not authorized for sale in the United States and (b) differed

materially from the authorized [] version." *Id.*

> **2.**      **Whether the Strollers Sold by Sam's Club Were Authorized for Sale in the United States**

The parties dispute what it means for a product to be unauthorized for sale in the United States—in other words, what qualifies as a gray-market good.  Sam's Club contends that a product is a gray-market good only if it "is *imported* without the consent of the United States trademark holder."  *See Montblanc-Simplo*, 172 F. Supp. 2d at 236 n.5 (quotations omitted and emphasis added).  UPPAbaby replies that the test is simply whether a product was authorized for sale in the United States, whether or not it was imported without the trademark holder's consent.

The difference matters here.  There is no dispute that the strollers sold by Sam's Club were not authorized by UPPAbaby to be sold in the United States.  Sam's Club acquired them from Akstrom, which had in turn acquired them from Global Branding, which was authorized to sell them only in Central or South America.  (*See* Apotheloz Dep. at 42:5-43:7, 102:23-103:5).  By contrast, there is no evidence that Sam's Club actually imported the strollers into the United States without UPPAbaby's consent.  At least some of the strollers were sent directly to Sam's Club's or Akstrom's warehouses and never left the country (after UPPAbaby imported them from the manufacturer).  (*See* Jason Decl., Ex. 3 at 3, Jason Decl., Ex. 4 at 9-10).  While UPPAbaby contends that Akstrom or Sam's Club imported some of the strollers, its only cited evidence does not support that claim.  (*See* Claypool Dep. at 55:22-56:23, 57:1-13).[8]

UPPAbaby's definition of a gray-market good—that it need only be unauthorized for sale in the United States—is better supported by the case law.  To be sure, courts have occasionally defined gray-market goods as those "*imported* without [] consent."  *See, e.g.*, *Heraeus Kulzer*

---

[8] UPPAbaby also cites to Sam's Club representation on its website that its strollers were imported.  (*See* Am. Compl., Ex. 3).  But that much is undisputed; the question is whether Sam's Club or its suppliers—as opposed to UPPAbaby—are the ones that imported them.

*LLC*, 2013 WL 3305284, at *3 (emphasis added); *Montblanc-Simplo*, 172 F. Supp. 2d at 236 n.5; *see also Nestle*, 982 F.2d at 635 (defining gray-market goods as those "brought into this country" without permission).[9]  But when the First Circuit set forth the rule for when a gray-market good could violate federal trademark law, it described the inquiry as whether the product was "not authorized for sale in the United States"—not whether it was imported without permission.  *See Nestle*, 982 F.2d at 638.  And courts that have described gray-market goods as products imported without consent have also described them as goods that were "not intended to be sold in the United States."  *See, e.g., Heraeus Kulzer LLC*, 2013 WL 3305284, at *3; *Montblanc-Simplo*, 172 F. Supp. 2d at 236.

Furthermore, defining a gray-market good by whether its sale, rather than its importation, was unauthorized also better serves the purposes behind the rule.  The sale of materially different goods violates federal trademark law because "a difference in products bearing the same name confuses consumers and impinges on the local trademark holder's goodwill."  *Nestle*, 982 F.2d at 638.  That harm to the trademark holder's goodwill occurs because of the unauthorized sale, not the unauthorized importation.  For that reason, courts have enjoined the sale of domestic products if that sale was unauthorized and they were sold "in conditions materially different from those offered by the trademark owner."  *See Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998); *see, e.g., Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 7-8 (2d Cir. 1996).  Therefore, a gray-market good is better defined as one that is not authorized for sale in the United States, whether or not it was originally imported with the consent of the trademark

---

[9] The Supreme Court has also defined gray-market goods as those "imported without the consent of the United States trademark holder."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 285 (1988).  However, that statement is of limited guidance here, because the Supreme Court was not considering when a defendant could be liable for the unauthorized domestic sale of a trademarked product.  *See id.* (addressing "the issue whether the Secretary of the Treasury's regulation permitting the importation of certain gray-market goods is a reasonable agency interpretation of § 526 of the Tariff Act") (citations omitted).

holder.

Accordingly, because it is undisputed that the strollers sold by Sam's Club were not authorized for sale in the United States, Sam's Club may be liable for trademark infringement if there were material differences between the strollers it sold and UPPAbaby's authorized versions.

### 3.   Whether There Were Material Differences Between the Strollers Sold by Sam's Club and the Authorized Versions

The First Circuit has described the "threshold of materiality" as "always quite low" in gray-market goods cases. *Nestle*, 982 F.2d at 641.  It "has defined a 'material' difference broadly to encompass 'any difference between the registrant's product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product.'" *Montblanc-Simplo*, 172 F. Supp. 2d at 237 (quoting *id.*).  "Because 'it is by subtle differences that consumers are most easily confused,' the First Circuit has instructed that 'the threshold of materiality must be kept low enough to take account of potentially confusing differences—differences that are not blatant enough to make it obvious to the average consumer that the origin of the product differs from his or her expectations.'" *Id.* (quoting *Nestle*, 982 F.2d at 641).  At the same time, it has advised that "[t]here is no mechanical way to determine" whether a difference is material; the analysis "must be done on a case-by-case basis." *Nestle*, 982 F.2d at 641.  If a material difference does exist, it "creates a presumption of consumer confusion as a matter of law." *Id.* at 640.

It is not entirely clear whether the materiality of any product differences is a pure question of law or a mixed inquiry of both law and fact.  The First Circuit has implied that while the existence of any product differences is a factual question, the materiality of those differences is a matter of law. *See id.* at 642.  Courts in this district have repeatedly determined the

materiality of differences on summary judgment without framing it as a factual question. *See, e.g.*, *Heraeus Kulzer LLC*, 2013 WL 3305284, at *6; *Bose Corp.*, 2012 WL 4052861, at *8-9. Accordingly, the Court will treat materiality as a matter of law. However, whether any product differences exist remains a question of fact. *See Nestle*, 982 F.2d at 642.

Here, UPPAbaby alleges three material differences between the strollers that it authorized for sale in the United States and those sold by Sam's Club. UPPAbaby contends that only its authorized versions were (1) subject to its quality-control procedures in the distribution chain, (2) accompanied by its customer-support services, and (3) covered by its manufacturer's warranty.

a.      **Quality Control**

Quality-control procedures are any methods that a company uses to oversee the quality of the products that it sells, such as inspections, tests, or protective measures. *See id.* "Differences in quality control methods, although not always obvious to the naked eye, are nonetheless important to the consumer." *Id.* at 643. A "substantial variance in quality control" constitutes a material difference. *Id.*; *see, e.g.*, *Montblanc-Simplo*, 172 F. Supp. 2d at 239-240; *Heraeus Kulzer LLC*, 2013 WL 3305284, at *5.

Here, the quality-control procedures at issue do not involve the actual manufacture of the product. The authorized strollers and the gray-market strollers are identical, at least when they leave the UPPAbaby warehouse in Massachusetts. Instead, UPPAbaby contends that there are substantial variations between how it and Sam's Club ensure the quality of the strollers as they are distributed to consumers. Specifically, it contends that it ensures that the strollers "reach the customer with as few supply chain steps as possible and maintain[s] close quality control at all steps in its distribution." (Pl. Mem. at 17). It contends that Sam's Club performs no such quality-control procedures and its supply chain "adds at least five additional steps" that the strollers and their packaging are not designed to withstand. (*Id.*).

Sam's Club does not dispute that the parties' supply chains differ, but contends there is no evidence that this ever actually affected the strollers. Such evidence is not strictly necessary. "Because quality control measures may create subtle differences in quality that are difficult to measure but important to consumers, courts do not require trademark owners to show that the actual quality of the inspected goods is measurably higher than that of the uninspected goods." *Iberia Foods*, 150 F.3d at 304; *see also Nestle*, 982 F.2d at 643. "At the same time, 'quality control' is not a talisman the mere utterance of which entitles the trademark owner to judgment." *Iberia Foods*, 150 F.3d at 304. "Rather, the test is whether the quality control procedures established by the trademark owner are likely to result in differences between the products" that are material. *See id.*; *see also Warner-Lambert Co.*, 86 F.3d at 6 (requiring trademark holder to show that its quality-control procedures were substantial and not pretextual). UPPAbaby thus is not required to present evidence that any stroller sold by Sam's Club was actually inferior due to different quality-control procedures. It must, however, show that the absence of quality control in the distribution chain is likely to result in material differences between the strollers.

Here, that is the subject of a factual dispute. On the one hand, there is some evidence that UPPAbaby's quality-control procedures may result in material differences. For example, it appears that on one occasion, Sam's Club shipped a stroller to a customer that was different from what it had advertised. (Nipps Dep. at 67:13-23). It is possible that this error was caused by differences in how UPPAbaby and Sam's Club track the strollers while they are in inventory. (*See* Claypool Dep. at 56:4-12 (explaining that Sam's Club assigns the strollers "new" product codes upon receiving them)). Furthermore, it is undisputed that due to supply chain differences, the strollers sold by Sam's Club were likely to have been shipped several more times than those sold by authorized UPPAbaby retailers. (*Compare id.* at 59:13-18 (describing how the strollers

sold by Sam's Club were shipped to New York, to Kansas, and then to its fulfillment centers) *with* Apotheloz Dep. at 26:21-25 (explaining that authorized retailers receive their strollers directly from UPPAbaby's warehouse)).  UPPAbaby contends that those additional shipments risked damaging the strollers.  On the other hand, there is no evidence that the shipping precautions taken by Sam's Club are any different from those taken by UPPAbaby or its authorized retailers.  Moreover, it is unclear whether UPPAbaby's authorized retailers, such as Amazon, also ship the strollers further before delivering them to customers.  Similarly, aside from the number of times the strollers are shipped, UPPAbaby has not shown with any specificity what actual quality-control procedures it observed, or how they differed from those used by Sam's Club or its suppliers.  For example, while it is true that Sam's Club once mistakenly sent a customer a different model than was advertised, it is certainly plausible that authorized retailers occasionally made that same type of mistake.

On this record, a jury could reasonably conclude either that there are important differences between UPPAbaby's and Sam's Club's quality-control procedures or that there are no (or only trivial) differences.  Thus, because there is a genuine dispute of fact as to whether there are any material differences in the parties' quality-control procedures, summary judgment on that issue in favor of UPPAbaby will be denied.

### b.  <u>Customer Support</u>

Customer support includes any advice on a product's features or use that is offered by a manufacturer or retailer to customers.  *See Heraeus Kulzer LLC*, 2013 WL 3305284, at *6.  For example, a manufacturer may staff a hotline to answer questions about its products.  *See, e.g.*, *id.* At least one court has found differences in customer support to be material, albeit in combination with other differences.  *See id.* (finding material differences where plaintiff employed customer-service staff to answer questions about its products but defendant did not).

UPPAbaby contends that only its authorized retailers offer its superior customer support and product service.  While it is true that "service commitments"—that is, promises to repair or replace a product—may be material, those will be addressed separately in the context of the warranty issue.  *Cf. Nestle*, 982 F.2d at 639 n.7 (discussing "warranty protection or service commitments").  The question here is whether the advice and information that is available for UPPAbaby strollers sold by Sam's Club differs materially from what is available for strollers sold by UPPAbaby's authorized retailers.

It is not clear that there were any differences between the customer support that UPPAbaby provided for the strollers sold by Sam's Club and what it provided for those sold by its authorized retailers.  UPPAbaby contends that it maintains a customer-support team to advise consumers on how to use and repair its strollers.  (*See* Apotheloz Dep. 70:1-18).  But Sam's Club's customers may have had the same access to that resource as anyone else; there is evidence that those customers called and received help from UPPAbaby's customer-support team on several occasions.  (*See, e.g.*, Harris Decl., Exs. L, N, W).  Thus, it is not clear that there were any differences in customer support, at least in terms of what was available from UPPAbaby itself.

UPPAbaby contends that there were differences in customer support at the retailer level. It says that only its authorized retailers had invested the time and money to train their employees on how to display its strollers properly, recommend a suitable model for each customer, and answer maintenance questions.  (Pl. Reply at 16).  And it contends that Sam's Club had made no such investments in its customer-support staff.

There is some evidence in the record that Sam's Club's customer-support staff was less than fully informed about UPPAbaby's strollers.  On one occasion, a member of its customer-

support staff called UPPAbaby's own support hotline to ask about a stroller.  (Harris Decl., Ex. T).  But it is not clear whether the customer support at UPPAbaby's authorized retailers was substantially different.  The only evidence about the quality of that support are broad statements by UPPAbaby's employees that authorized retailers are trained in how to sell its various stroller models and that unauthorized retailers are not.   (Apotheloz Dep. at 9:15-11:6; Monahan Dep. at 43:21-44:4).

Furthermore, one of UPPAbaby's authorized retailers is Amazon, which operates an online retail platform.  (*See* Monahan Dep. at 14:8-19).  It is not clear, to say the least, whether Amazon trains its employees on how to display UPPAbaby strollers properly and recommend suitable models to customers, or how it would even go about doing so.

On this record, it is not clear whether there were any differences, let alone material ones, between the customer support available to Sam's Club's customers and that offered to the customers of authorized retailers.  *Compare Heraeus Kulzer LLC*, 2013 WL 3305284, at *6 (finding material differences where defendant did not employ any customer support staff whatsoever to answer questions).  Therefore, and at a minimum, whether there were material differences in customer support is a matter of factual dispute, and summary judgment on that issue in favor of UPPAbaby is inappropriate.

### c.      Warranty Protection

The next question is whether there were any material differences between the strollers in terms of warranty protection.  The First Circuit has said that warranty differences "may well" be material.  *Nestle*, 982 F.2d at 639 n.7.  Several courts in this district have thus found that differences in "warranty coverage contribute to a finding of material differences."  *Heraeus Kulzer LLC*, 2013 WL 3305284, at *6; *see, e.g.*, *Bose Corp.*, 2012 WL 4052861, at *8-9;

*Montblanc-Simplo*, 172 F. Supp. 2d at 240-41. [10]

It is undisputed that the UPPAbaby warranty by its terms, does not apply to the strollers sold by unauthorized retailers such as Sam's Club.  (*See* UPPAbaby Warranty).  Thus, that would seem to create a difference in warranty protection between the strollers sold by Sam's Club and authorized versions.

Sam's Club contends that there is nonetheless a factual dispute as to whether those potential differences actually exist in practice.  It contends that because UPPAbaby sometimes extended its warranty, upon customers' request, to the strollers sold by Sam's Club, "[t]his arbitrary decision should not be the basis of a material difference" between the products.  (Defs. Opp. at 11).

It seems true that as a factual matter UPPAbaby has occasionally extended its warranty to strollers that do not otherwise qualify.  It appears that on at least two occasions, customers who bought strollers from Sam's Club were able to register them for the warranty after calling UPPAbaby's customer-service hotline.  (Jason Decl., Ex. 5; Jason Decl., Ex. 6).  And it seems that several of Sam's Club's customers were able to register their strollers for warranty coverage on the UPPAbaby website.  (*See* Jason Decl., Ex. 7 (listing 27 such customers)).  Those

---

[10] It is unclear whether a difference in warranty protection, standing alone, can be material.  It is true that the First Circuit has set the bar for materiality "quite low" and it is possible "that consumers would likely consider" differences in warranty coverage alone "to be relevant when purchasing a product."  *See Nestle*, 982 F.2d at 641. But it has also shied away from "mechanical" rules of what differences are material and instead counseled that must be determined "on a case-by-case basis."  *Id.*  Of the cases cited by UPPAbaby that considered the importance of such a difference in warranty coverage, only one held that it was independently material.  *Compare Bose Corp.*, 2012 WL 4052861, at *8-9 (finding "each of these differences," including "differences in warranty coverage," was material) *with Heraeus Kulzer LLC*, 2013 WL 3305284, at *5-6 (finding other differences in product composition, quality control, packaging, and customer support); *Monblanc-Simplo*, 172 F. Supp. 2d at 238-241 (concluding that several differences, "taken as a whole," were material).  And even in that case, several other differences were also present, including some that substantially affected the functionality of the products at issue.  *See Bose Corp.*, 2012 WL 4052861, at *8-9 (identifying differences between entertainment systems in their DVD region coding, remote controls, and electrical socket compatibility).  There are no such functional differences here.

18

registrations, whether by phone or online, likely entitled those customers to warranty service and even to a one-year extension.  (*See* UPPAbaby Warranty).

However, UPPAbaby's decision to offer its warranty for Sam's Club's strollers on some occasions does not mean they actually qualified for such protection.  It would frustrate the purpose of federal trademark law to require UPPAbaby to refuse warranty protection, risking further harm to its goodwill, in order to preserve its trademark claims.  *Cf. Osawa & Co. v. B&H Photo*, 589 F. Supp. 1163, 1168 (S.D.N.Y. 1984) (finding that a trademark holder "gives warranty service on defendants' grey market sales not out of stupidity or neglect" but because denying warranty service would "damage the reputation of [its] mark").  Thus, even though UPPAbaby has occasionally declined to enforce the limitations on its warranty, it has not waived them altogether, and doing so does not erase the differences in warranty coverage between the products.  *See Swatch S.A. v. New City, Inc.*, 454 F. Supp. 2d 1245, 1251 (S.D. Fla. 2006) (holding that a plaintiff's "business decision to honor otherwise void warranties cannot shield [d]efendant from liability for trademark infringement.").

Sam's Club also contends that the laws of some states require that its products enjoy the same warranty protection as authorized versions.  For example, New York law prohibits manufacturers from limiting warranty coverage "solely for the reason that such merchandise is sold by a particular dealer or dealers."  N.Y. Gen. Bus. Law § 369-b (McKinney).  But Sam's Club does not cite to any instance in which UPPAbaby honored its warranty for a Sam's Club customer in New York.  The fact that at least one state's law requires UPPAbaby to honor its warranty for strollers sold by Sam's Club does not prove that it ever actually did so.[11]

---

[11] Whether UPPAbaby's denial of warranty coverage to such strollers would make it liable under the laws of New York, or other states, is a separate issue beyond the scope of its trademark-infringement claims.

Furthermore, even if it had, it is unclear whether that rule applies anywhere but New York. Thus, the strollers sold by Sam's Club could have different warranty protection depending on the state where the product was purchased.

In short, Sam's Club has not established that there is a genuine factual dispute as to whether there was any difference in warranty coverage.  On this record, there is clearly a difference:  the strollers sold by Sam's Club are not eligible for the manufacturer's warranty, but the authorized versions are.

The question becomes whether that difference is material.  Sam's Club contends that the difference here is immaterial because their own "100% Merchandise Satisfaction Guarantee" is superior.  (Defs. Opp. at 2).  But that is not the issue; the question is whether the products it sold were materially different, not whether they were inferior.  That is because a consumer may still be confused "not only in the more obvious cases, involving the sale of inferior goods in derogation of the registrant's mark, but also in the less obvious cases, involving the sale of goods different from, although not necessarily inferior to, the goods that the customer expected to receive."  *Nestle*, 982 F.2d at 636.  Thus, even a product covered by a more generous warranty may still be materially different if that warranty is substantially unlike the one that applies to authorized versions.  *See, e.g.*, *Bose Corp.*, 2012 WL 4052861, at *8-9 (finding material differences where the unauthorized version had a two-year warranty but the authorized version had a one-year warranty).

However, while differences in warranty protection could be material, whether that is the case here is not clear on this record.  At least on paper, the distinctions between UPPAbaby's warranty and Sam's Club's "100% Merchandise Satisfaction Guarantee" would likely matter to consumers.  One important difference is the availability of repair versus replacement.  Under

UPPAbaby's warranty, a customer can obtain repairs and replacement parts for a broken stroller, but not an entirely new stroller or a refund.  (Apotheloz Dep. at 69:6-25, 74:19-24).  But under Sam's Club's warranty, a customer can receive only a refund or a replacement, assuming one is available.  (Olivero-Sanchez Dep. at 165:22-166:1, 170:18-171:1.).  A customer could reasonably decide that one warranty or the other was better, but they are indisputably different.  However, that difference may be only theoretical.[12]  It appears that UPPAbaby has never actually repaired a stroller under its manufacturer's warranty.  (*See* Apotheloz Dep. at 74:25-75:20).  Its own employee admitted that the warranty primarily serves as "marketing," rather than to provide real product support.  (*Id.* at 75:23-25).  Furthermore, it appears that under UPPAbaby's warranty—as under Sam's Club's—customers may receive refunds.  (*Id.* at 77:24-78:23).

Thus, on this record, it appears possible that in actual practice, there may be little or no difference between UPPAbaby's and Sam's Club's warranties.  However, the resolution of that issue depends on disputed factual issues, making summary judgment in favor of UPPAbaby inappropriate.

### d.    Conclusion

In summary, there are genuine factual disputes as to whether any material differences exist between the strollers sold by Sam's Club and those sold by UPPAbaby through its authorized channels.  It is true that the standard for materiality is "always quite low" in gray market goods cases.  *Nestle*, 982 F.2d at 641.  Even so, on this record jurors could reasonably disagree as to whether any of the alleged product differences meaningfully exist in a way that would likely be relevant to consumers.  *See id.*  Those factual disputes preclude summary

---

[12] It is true that several of Sam's Club's customers apparently contacted UPPAbaby to ask whether their strollers were covered by the manufacturer's warranty.  (*See, e.g.*, Harris Decl., Exs. L, S, W, Y).  But while that tends to show they may have been confused about which warranty applied, it does not show that there were ultimately real differences in those warranties that would have mattered to them.

judgment in favor of UPPAbaby on its claims of trademark infringement.

### B.    Defendants' Motion for Partial Summary Judgment

Sam's Club has moved for partial summary judgment on the grounds that UPPAbaby is not entitled to money damages under any of its three theories of recovery and that it cannot succeed on its claim under Mass. Gen. Laws ch. 93A.

### 1.    Whether UPPAbaby Can Recover Money Damages

"Section 1117(a) of the Lanham Act provides that a successful plaintiff shall be entitled 'subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.'" *HipSaver Co. v. J.T. Posey Co.*, 497 F. Supp. 2d 96, 106 (D. Mass. 2007) (quoting 15 U.S.C. § 1117(a)); *see also Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 78 (1st Cir. 2008).  "The First Circuit has developed a quartet of rules to govern Lanham Act claims seeking monetary relief." *HipSaver Co.*, 497 F. Supp. 2d at 106. Those rules are as follows:

> (1) a plaintiff seeking damages must prove actual harm, such as the diversion of sales to the defendant;
>
> (2) a plaintiff seeking an accounting of defendant's profits must show that the products directly compete, such that defendant's profits would have gone to plaintiff if there was no violation;
>
> (3) the general rule of direct competition is loosened if the defendant acted fraudulently or palmed off inferior goods, such that actual harm is presumed; and
>
> (4) where defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory.

*Aktiebolaget Electrolux v. Armatron Int'l Inc.*, 999 F.2d 1, 5 (1st Cir. 1993).

Here, UPPAbaby seeks three categories of monetary damages:  (1) the costs of future corrective advertising; (2) compensation for extra personnel expenses incurred; and (3) the disgorgement of Sam's Club's profits.

a.     **Corrective Advertising**

The first set of damages sought by UPPAbaby are the costs of corrective advertising—in other words, a marketing campaign intended to offset the brand damage allegedly inflicted by Sam's Club.

A plaintiff's damages "may include 'the costs of corrective advertising'" to repair injury to its business reputation. *PODS Enterprises, LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1282 (M.D. Fla. 2015) (emphasis omitted) (quoting *Aronowitz v. Health–Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008)).  "In a typical case, a plaintiff acts quickly to dispel the defendant's harmful statements by conducting its own corrective advertising campaign well before trial." *First Act Inc. v. Brook Mays Music Co.*, 429 F. Supp. 2d 429, 437 (D. Mass. 2006).  Such retrospective corrective advertising damages "are easier to quantify because the plaintiff can represent out-of-pocket corrective advertising costs already incurred." *Id.*

Here, however, UPPAbaby seeks *prospective* damages:  that is, "damages to fund post-trial corrective advertising that has yet to take place."  (*See* Jason Decl., Ex. 6 ("Holt Report") at 22-31).  *See id.*; *see also National Fire Prot. Ass'n, Inc. v. International Code Council, Inc.*, 2006 WL 839501, at *29 (D. Mass. Mar. 29, 2006).  Courts have occasionally awarded such prospective corrective advertising damages, but with some reservations.  *See First Act*, 429 F. Supp. 2d at 438 (calling it "a somewhat novel theory of damages that has been limited in its application"); *PBM Prod., Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 417, 420 (E.D. Va. 2001) ("[T]here have only been a few false advertising case[s] where a federal court granted prospective corrective advertising expenditures.")).

One reason that courts have hesitated to award such damages is the substantial potential for inaccuracy.  To start, "reputational harm is inherently more difficult to quantify than strictly pecuniary harms such as lost profits."  *First Act*, 429 F. Supp. 2d at 438; *see also National Fire*,

2006 WL 839501, at *29.  And a corrective advertising award must be tailored to the injury

suffered; it is meant only to repair the plaintiff's business goodwill, not to provide a free

advertising campaign.  *See Zazú Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992)

(rejecting corrective advertising award that was "unrelated to the plaintiff's injury"); *National

Fire*, 2006 WL 839501, at *29.  It becomes even harder to "determin[e] the appropriate amount

of corrective advertising necessary" when a substantial length of time has passed since the

alleged injury.  *See First Act*, 429 F. Supp. 2d at 438-39 (quoting Arthur Best, *Monetary

Damages for False Advertising*, 49 U. PITT. L. REV. 1, 23 (1987)).  Thus, courts in this district

have awarded prospective advertising damages "only if it compensates the injured party for

identifiable harm to its reputation."  *Id.*; *see also National Fire*, 2006 WL 839501, at *29.

There is some evidence of identifiable harm to UPPAbaby's brand in the record.  It

appears that some of Sam's Club's customers called the UPPAbaby support hotline, unsure about

whether their strollers were under warranty.  (*See, e.g.*, Harris Decl., Exs. L, S).  Others

communicated online with UPPAbaby support staff about the same question.  (*See, e.g.*, Harris

Decl., Exs. W, Y).  Another customer called to report that Sam's Club had advertised a different

model year stroller than what it had for sale, possibly due to quality-control differences, and that

he or she felt "confused" and deceived.  (*See* Harris Decl., Ex. S).  Any harm to UPPAbaby's

brand caused by this consumer confusion is compensable, and therefore, at least in theory, it

could recover the costs of a corrective advertising campaign that would effectively repair that

harm.[13]

However, the claim for proposed corrective advertising necessarily fails.  The marketing

---

[13] Notably, UPPAbaby could have sought other forms of relief for that alleged harm to its brand, such as an order requiring Sam's Club to undertake a corrective advertising campaign.  It is also noteworthy that UPPAbaby did not conduct any form of corrective advertising when it discovered the alleged harm, and thus does not seek recovery of such damages on a retrospective basis.

expert used by UPPAbaby, Ross Fishman, has estimated the cost of corrective advertising campaigns that would "undo damage done to" UPPAbaby's brand "by having their products sold at a steep discount through Sam's Club, and with false messages about the warranty offered." (Jason Decl., Ex. 4 ("Fishman Report") at 4; *see also* Jason Decl., Ex. 3 ("Fishman Dep.") at 54:10-17).[14]

To start, UPPAbaby's proposal is not tailored to the injury for which it could actually recover.  Fishman proposes to remedy any harm to UPPAbaby's brand caused by the fact that Sam's Club both sold materially different strollers and did so at discounted prices.  (Fishman Report at 4; Fishman Dep. at 54:10-17; *see also* Pl. Opp. at 5-6 (citing Apotheloz Dep. at 33:11-23) (suggesting that UPPAbaby's brand was harmed by discounted sales)).  But even if such harm occurred, sales at discounted prices do not violate the Lanham Act.  Under the first-sale doctrine, Sam's Club could have lawfully sold UPPAbaby strollers, even at a steep discount, as long as they were identical to genuine versions.  *See Heraeus Kulzer*, 2013 WL 3305284, at *3-4.[15]  Thus, any harm to UPPAbaby's brand caused simply by discount sales is not recoverable. Rather, the harm that is recoverable, if any, is that caused by any confusion arising out of material differences between the strollers sold by UPPAbaby and those sold by Sam's Club.[16] Therefore, UPPAbaby is entitled to corrective advertising only to the extent necessary to correct that confusion—not to offset all harm due to the sale of its strollers at a discount, as it proposes

---

[14]  Plaintiff's other expert witness, Krista Holt, relied on cost estimates provided by Fishman and a marketing firm, Small Army, which suffers from the same flaws as Fishman's analysis.  (Holt Report at 22-31).

[15]  Even if Sam's Club's versions had unavoidable material differences—for example, because they were not covered by the manufacturer's warranty—Sam's Club could still legally sell them if it effectively disclaimed those differences.  *See Heraeus Kulzer LLC*, 2013 WL 3305284, at *7.

[16]  UPPAbaby may also be able to recover under its false advertising claim for any harm to its brand caused by representations by Sam's Club that its strollers were covered under the manufacturer's warranty.  Even if it can, that recovery would be limited to the harm caused by those representations and would not include any caused simply by the sale of UPPAbaby strollers at lower prices.

to do.  *Cf. Zazú Designs*, 979 F.2d at 506 ("To justify damages to pay for corrective advertising a plaintiff must show that the confusion caused by the defendant's mark injured the plaintiff . . .").

Furthermore, UPPAbaby has not presented any evidence of how its proposal would effectively remedy any harm to its brand.  Fishman proposed to send an unspecified message—either by mail or by digital advertising—to as many consumers who may have seen Sam's Club's advertising as is possible.  (Fishman Report at 4-8).  He did not identify the contents or layout of that message, let alone explain how it would remedy the consumer confusion arising from any material differences in the strollers sold by Sam's Club.  (*See id.*).  This failure to show that "unspecified advertising would be an effective way to remedy that confusion" is a fatal flaw in his analysis.  *See Simon Prop. Grp., L.P. v. mySimon, Inc.*, 2001 WL 66408, at *26 (S.D. Ind. Jan. 24, 2001).  Without such a showing, UPPAbaby's proposal is simply a free advertising campaign "unrelated to [its] injury," and therefore it is "an unacceptable way to estimate damages."  *See Zazú Designs*, 979 F.2d at 506.

Accordingly, the motion of Sam's Club for summary judgment will be granted as to the issue of whether UPPAbaby can recover damages for prospective corrective advertising.

### b.     Personnel Expenses

The second category of damages sought by UPPAbaby are the alleged additional personnel expenses that it incurred because of the unauthorized sales.  Specifically, it seeks compensation for the time spent by its employees investigating the sale of its strollers by Sam's Club and addressing related complaints by customers and retailers.  (*See* Holt Report at 32-34).

Generally, the Lanham Act entitles a successful plaintiff, "subject to the principles of equity," to recover "any damages [it] sustained."  15 U.S.C. § 1117(a).  A plaintiff is entitled to damages if it can "prove actual harm."  *See Aktiebolaget Electrolux*, 999 F.2d at 5.  There are no clear limits as to what form that harm must take, provided that the injury was caused by the

26

wrongful conduct.  *See, e.g.*, *First Act*, 429 F. Supp. 2d at 439-440 (awarding damages for corrective advertising).  It therefore appears that additional personnel expenses arising from unauthorized sales in violation of the statute are recoverable as a general matter.

That raises the question of what harm UPPAbaby actually suffered, and whether that harm is sufficiently quantifiable to merit an award of damages.  In substance, UPPAbaby seeks compensation for the time it contends that its employees spent on efforts to contain the fallout from the actions of Sam's Club.  One obvious issue is that most, if not all, of those employees were salaried, so the company would have paid them regardless, and therefore it has not suffered any incremental out-of-pocket losses.  (*See* Jason Decl., Ex. 7; Jason Decl., Ex. 9 ("Teshome Report") ¶¶ 37-40).  Nonetheless, it is possible that the company could recover for lost opportunity costs—that is, the time and attention those salaried employees would have instead spent on other projects that benefit the company.  The question is whether sufficient factual evidence has been produced to prove a reasonable likelihood of actual harm to the company.

The primary evidence that quantifies the amount of time spent on remedial efforts by UPPAbaby's employees is a spreadsheet entitled "UPPAbaby Loss Assessment."  (Jason Decl., Ex. 7 ("Loss Assessment")).[17]  To start, it is questionable whether the Loss Assessment should be considered part of the record.  It is not clear who created the document or how, and it was only produced to Sam's Club after the close of fact discovery.  (*See* Jason Decl., Ex. 8).  Furthermore, even if the Loss Assessment is properly part of the record, it is an imperfect measure of the harm to UPPAbaby.  It does purport to set forth a record of employee-hours spent

---

[17] The Rule 30(b)(6) deposition witness produced by UPPAbaby also testified that its employees undertook some remedial efforts.  (*See* Apotheloz Dep. at 42:5-15).  However, she said only that some employees had traced product serial numbers to ascertain the source of Sam's Club's strollers.  (*See id.*).  She did not quantify the amount of time employees spent on those efforts, let alone explain how the re-allocation of that time actually harmed UPPAbaby.

addressing issues with the gray-market strollers.  But it is unclear whether all of those hours are compensable.[18]  And the Loss Assessment does not identify, even in general terms, how UPPAbaby was harmed by the re-allocation of the time of its salaried employees.

However, those shortcomings in the Loss Assessment do not entirely foreclose UPPAbaby's recovery of its personnel expenses.  To start, while the Loss Assessment appears to be the most complete record of the time spent by UPPAbaby's employees on remedial efforts, it is not the only one.  It seems that in September 2018, UPPAbaby's employees created an informal, partial "best estimate of [the] time spent on this issue by everyone involved."  (*See* Teshome Report ¶¶ 35-36 (citing UPY0000560)).  Thus, even without the Loss Assessment, the record contains some evidence of the time spent by UPPAbaby's employees on remedial efforts.[19]

It appears that some of those employees may have been compensated on an hourly basis. (Teshome Report ¶¶ 40 & 40 n.49; *see* Holt Report, Ex. 8).  If that is true, then the hours those employees spent on remedial efforts may be compensable.  Furthermore, UPPAbaby may be able to recover for at least some of the time spent on remedial efforts by its salaried employees. Again, the problem is that it would have paid those employees regardless, and presumably the only harm it suffered from re-allocating their time were the lost hours they would have spent on other duties.  Still, proving the exact value of those lost hours seems extremely difficult, and

---

[18] For example, the document records hours that the UPPAbaby sales operations team spent answering questions from retailers and customers about the fact that Sam's Club sold the strollers.  (Loss Assessment).  But the mere fact that Sam's Club sold UPPAbaby strollers is not actionable; the harm, if any, arises from the fact that there were material differences in the strollers.  The incremental cost of responding to a customer inquiry about warranty protection would thus be recoverable; it is less clear whether UPPAbaby can recover the cost of responding to a generalized inquiry about the availability of strollers at Sam's Club.

[19] An expert witness for Sam's Club, Abel Teshome, contends that this estimate of the time spent on remedial efforts by Sam's Club's employees is inconsistent with the estimates set forth in the Loss Assessment. (Teshome Report ¶ 36).  Even if that is true, it would likely only lower the amount of personnel expenses that UPPAbaby could recover, not bar the recovery of those expenses entirely.

using the number of hours those employees spent on remedial efforts is not an unreasonable approximation.  As long as that approximation is not speculative or punitive, it may support an award of damages for additional personnel expenses.  *Cf. ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990) ("When assessing these actual damages, the district court may take into account the difficulty of proving an exact amount of damages . . . as well as the maxim that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.") (internal quotations omitted).

In short, the evidence supporting the claim of damages for additional personnel expenses is problematic, but not to the extent that summary judgment should be granted on the issue. Accordingly, the motion of Sam's Club for partial summary judgment as to the issue of whether UPPAbaby can recover money damages for additional personnel expenses will be denied.

## c.    <u>Disgorgement</u>

Finally, UPPAbaby seeks disgorgement of Sam's Club's profits.  Sam's Club contends that this remedy is unavailable because it does not directly compete with UPPAbaby.

Disgorgement "may be awarded in a trademark infringement action 'subject to the principles of equity.'"  *Tamko Roofing Prod., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 35 (1st Cir. 2002) (quoting 15 U.S.C. § 1117(a)).  The First Circuit has identified three justifications for awarding disgorgement:  "(1) as a rough measure of the harm to plaintiff; (2) to avoid unjust enrichment of the defendant; or (3) if necessary to protect the plaintiff by deterring a willful infringer from further infringement."  *Id.*  To recover under the first of those theories, a plaintiff must prove both actual harm and direct competition.  *Fishman Transducers, Inc. v. Paul*, 2011 WL 1157529, at *1 (D. Mass. Mar. 29, 2011); *HipSaver Co.*, 497 F. Supp. 2d at 106.

Here, the parties are not direct competitors, because they operate at different levels of the market.  Sam's Club is a retailer; it sells strollers directly to consumers.  (*See* Walmart 10-K).

UPPAbaby is a manufacturer and wholesaler; it does not.  (Monahan Dep. at 7:21-8:4).  Thus, consumers who bought strollers from Sam's Club would not have otherwise bought them from UPPAbaby.  *See Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 196 (1st Cir. 2012) (explaining that direct competition requires "a substantial degree of equivalence and substitutability" between the parties' products).  It is true that those consumers may have instead bought them from one of UPPAbaby's authorized U.S. distributors.  (*See* Harris Decl., Ex. H at 134:23-135:13; Monahan Dep. at 14:8-19).  But that type of downstream substitution does not satisfy the direct-competition requirement.  The rationale behind the requirement is that "if the two companies are in the same line of business, defendant's profits may be presumptively similar to what plaintiff would have earned on the sale."  *Fishman Transducers*, 684 F.3d at 196; *see also Tamko Roofing*, 282 F.3d at 36 (justifying disgorgement as "a rough measure of the harm to plaintiff").  But because UPPAbaby and Sam's Club operate at different levels of the market, "no plausible one-to-one equivalent exists here as the number of sales diverted or the profits transferred" and so the requirement is not satisfied, even if Sam's Club's "violations *could* damage [UPPAbaby's] sales."  *See Fishman Transducers*, 684 F.3d at 196 (holding guitar component manufacturer did not directly compete with guitar retailer).[20]  Thus, UPPAbaby cannot show direct competition.

Disgorgement may still be appropriate, even absent direct competition, in the event of fraud or willful conduct.  *See Aktiebolaget Electrolux*, 999 F.2d at 5 (noting that the direct competition requirement itself may be "loosened if the defendant acted fraudulently"); *Tamko*

---

[20] This case is distinguishable from *Tamko Roofing Prod., Inc. v. Ideal Roofing Co.*, 282 F.3d 23 (1st Cir. 2002).  There, the defendant alleged that disgorgement was unwarranted because the parties competed in only "20–30% of their business."  *Id.* at 35.  The First Circuit held that because there had already been a finding of direct competition for some portion of the parties' businesses, disgorgement was appropriate and it was defendant's burden to prove any deductions.  *Id.* at 36-37 (citing 15 U.S.C. § 1117(a)).  Here, by contrast, UPPAbaby has failed to show any one-to-one substitution between its sales and those of Sam's Club.

*Roofing*, 282 F.3d at 36 (noting that disgorgement may be justified "to avoid unjust enrichment" or "if necessary to protect the plaintiff by deterring a willful infringer from further infringement"). That requires evidence of "willfulness" or "fraud, bad faith, or palming off." *See Tamko Roofing*, 282 F.3d at 36; *Aktiebolaget Electrolux*, 999 F.2d at 6 (observing that in the First Circuit, "damages have never been allowed under the deterrence or unjust enrichment theories absent some form of fraud.").

Here, a jury could reasonably conclude that Sam's Club acted willfully or in bad faith. Its supplier informed it in writing that the UPPAbaby warranty would not apply to the strollers if sold in the United States. (Olivero-Sanchez Dep. at 136:9-139:24). One could reasonably infer that Sam's Club received that message. (*See id.* at 140:18-19, 151:3-9 (explaining that Sam's Club "[doesn't] care about the warranty")). Nevertheless, Sam's Club allegedly advertised the strollers on their website as including the manufacturer's warranty. (Am. Compl., Ex. 3). That alleged misrepresentation—that the strollers fell under the UPPAbaby warranty even though they did not—is one of the underpinnings of UPPAbaby's trademark and false advertising claims. A jury could reasonably conclude either that it was a mistake, or that it was done willfully and with the intent to mislead consumers. Thus, because whether disgorgement may be justified hinges on a genuine factual dispute, summary judgment on that issue is inappropriate.

Accordingly, the motion of Sam's Club for partial summary judgment as to the issue of whether UPPAbaby can recover an award of disgorgement will be denied.

### 2.     Whether Plaintiff Can Succeed on Its Claim under Mass. Gen. Laws ch. 93A

Finally, Sam's Club contends that the claim for violations of Mass. Gen. Laws. ch. 93A fails as a matter of law because it cannot show that the alleged violations occurred "primarily and substantially" within Massachusetts. *See* Mass. Gen. Laws. ch. 93A, § 11.

Section 11 of chapter 93A expressly provides that no action may be brought under the statute unless the complained-of conduct occurred "primarily and substantially within the Commonwealth." *Id.* The defendant bears the burden of proving that the conduct occurred outside the state. *Id.*; *Zyla v. Wadsworth*, 360 F.3d 243, 255 (1st Cir. 2004). The critical inquiry is "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Comput. Co. v. Digital Equip. Corp.*, 438 Mass. 459, 473 (2003). In making that determination, a court should focus solely on the actionable conduct said to give rise to the violation; other conduct, no matter where it takes place, may not be considered. *Id.* at 473–74.

Here, it is undisputed that the actionable conduct was not centered in Massachusetts. The parties agree that Sam's Club's "advertisement and unauthorized sale of UPPAbaby strollers took place throughout the United States." (Pl. Resp. to Def. SOF ¶ 25). Because the allegedly infringing sales occurred throughout the country, the center of gravity—if there is one—is outside Massachusetts. *Fishman Transducers,* 684 F.3d at 197 ("Where wrongdoing is not focused on Massachusetts but has relevant and substantial impact across the country, the 'primarily' requirement of section 11 cannot be satisfied."); *see, e.g.*, *New England Gen-Connect, LLC v. US Carburetion, Inc.*, 2019 WL 1332891, at *2 (D. Mass. Mar. 25, 2019).

In response, UPPAbaby sets forth several factors that it says points towards Massachusetts. Most of those factors are irrelevant. For example, it contends that its strollers are stored in its warehouse in Massachusetts and sold by several authorized retailers in Massachusetts. But where that conduct occurs is irrelevant, because it was not what UPPAbaby contends violated chapter 93A—that is, the advertisement and sale of the strollers by Sam's Club. *See Kuwaiti Danish*, 438 Mass. at 473-74. The only relevant factor that arguably points

towards Massachusetts is that the principal place of business of UPPAbaby is in the state, which would plausibly mean it learned of and felt any financial injury there.  (*See* Pl. Opp. at 19).

However, a place of injury within Massachusetts is not a sufficient basis for finding that conduct occurred "primarily and substantially" within the Commonwealth.  *See, e.g.*, *New England Gen-Connect*, 2019 WL 1332891, at *2.  Indeed, if the courts were to apply a "place of injury" test, "practically no case involving a Massachusetts plaintiff would be exempt from [chapter] 93A status, no matter how negligible the defendants' business activity in this [s]tate." *New England Gen-Connect*, 2019 WL 1332891, at *2 (quoting *Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 25 Mass. App. Ct. 302, 309-310 (1988)).

Accordingly, the chapter 93A claim fails as a matter of law, and summary judgment as to that claim will be granted in favor of Sam's Club.

## IV.    Conclusion

For the foregoing reasons,

1.      The motion of plaintiff Monahan Products LLC, d/b/a UPPAbaby, for summary judgment of trademark infringement is DENIED.

2.      The motion of defendants Sam's East, Inc., and Sam's West, Inc., for partial summary judgment is GRANTED as to the claims for money damages for prospective corrective advertising and for violations of Mass. Gen. Laws ch. 93A (Count Four), and is otherwise DENIED.


**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  May 20, 2020                                      Chief Judge, United States District Court

33